[Civ. No. 13692. Second Dist., Div. Three. July 9, 1943.]

MARCELLA MULLANEY WEINER, Respondent, v. GEORGE J. MULLANEY et al., Appellants.

Henry G. Bodkin and Charles S. Gass for Appellants.

Herzbrun & Chantry for Respondent.

THE COURT.—Plaintiff instituted this action to obtain an accounting from her brother, George J. Mullaney, hereinafter referred to as "the defendant." Also joined as a defendant was her sister, Marie Mullaney, sued as such because of her refusal to join as plaintiff. A prolonged trial resulted in the entry of findings and judgment in favor of plaintiff and against defendant George J. Mullaney, requiring said defendant to pay to plaintiff the sum of $14,887.04, together with interest, and certain alternative judgments for recovery of Exeter Oil Company and Mt. Diablo Oil Company stock or

the value thereof in case delivery of said stock could not be had, from which judgment both defendants appeal.

The parties to this action are the surviving children of Agnes Mullaney, a widow, who in her lifetime owned certain real and personal property, consisting of an oil lease, stocks and cash. In 1927 the plaintiff married and left home, but the defendants continued to live with their mother until her death. Defendant Marie Mullaney taught school and was away a great deal of the time, but defendant George J. Mullaney, because of a "sleeping illness" requiring him to sleep 12 to 14 hours out of every 24, was unemployed for several years prior to his mother's death, and remained at home at all times. By reason of his constant attendance at home he became familiar with and was fully advised of his mother's finances and business affairs. He testified that when his mother became seriously ill in the early part of 1936 he conducted and managed her business for her and continued to do so until her death in January, 1937, at the age of 72 years; that during that time she gave him various sums of money without any restriction or limitation. In 1933 plaintiff and her family moved to London, England, and remained there continuously until November, 1937, except for two visits to the United States which plaintiff made in 1936 and 1937. While in England, plaintiff corresponded with her family regularly and they likewise with her. In the many letters which plaintiff received from her brother he continually advised her that their mother was going to put all of her property into the names of her children in equal shares, to wit, one-third each, in order to avoid probate and payment of inheritance taxes upon her death, and on several occasions stated that he needed plaintiff's power of attorney to properly record and protect her interests, pay taxes, bond assessments, etc. In reliance upon these representations the plaintiff executed and delivered to her brother a power of attorney. He, in turn, forwarded to plaintiff in England various sums of money representing her one-third share in the proceeds received from a sale of a 5 per cent landowner's royalty interest under an oil lease and, after the death of their mother, she was forwarded one-third of the royalty received from the lease. In 1938, after plaintiff's return to the United States, she requested of her brother additional money. He refused and stated that it was gone and that he had lost it in the stock market. She then discovered, among other things (a) that the real property

hereinafter referred to as Parcel 1 had been deeded one-half to her brother and one-quarter each to herself and her sister, instead of equally, (b) that he had sold 184 shares of Union Oil stock belonging to her and converted the proceeds to his own use, (c) that he had used the power of attorney vested in him to speculate on the stock market contrary to her instructions, and (d) had converted her share of the money due from her mother's estate. In June, 1938, she revoked the power of attorney and thereafter requested defendant to give her an accounting. Upon his refusal so to do, she commenced the present action.

The trial court proceeded on the issues joined on the amended complaint, which alleged among other things, that Agnes Mullaney during her lifetime owned certain real and personal property, consisting of parcels of land in Kern and Los Angeles Counties, of an oil lease on property located in Kern County [Parcel 1], of stocks of the Union Oil Company, Consolidated Steel Company, Exeter Oil Company, Mt. Diablo Oil Company, and other corporations, and of cash, which properties were owned by the three children, plaintiff and defendants, in equal shares after their mother's death and one-third of which was held by defendant "in trust" for plaintiff; that on November 5, 1928, Agnes Mullaney "signed and acknowledged" a deed to Parcel 1 "purporting" to convey one-half to George J. Mullaney, and one-fourth each to the plaintiff and Marie Mullaney, which deed was recorded by George J. Mullaney on April 24, 1936, to avoid probate proceedings and the payment of inheritance tax; that defendant "acknowledged in writing . . . by instruments subscribed by him, that said real property [Parcel 1], all the proceeds of oil and gas produced therefrom, and all personal property belonging to said Agnes Mullaney were held by him, one-third for the plaintiff, one-third for himself and one-third for the defendant Marie E. Mullaney"; that defendant sold a 2½ per cent landowner's royalty on Parcel 1 and refused to deliver plaintiff's one-third to her; that prior to her death Agnes Mullaney assigned 184 shares of Union Oil stock to plaintiff, which George had recorded in plaintiff's name on the company's books and subsequently transferred these shares out of plaintiff's name into his own, sold them and converted the proceeds; that Agnes Mullaney assigned to plaintiff and each of the defendants one-third of 1500 shares of Consoli-

dated Steel stock owned by her; that George opened a marginal brokerage account, contrary to plaintiff's instructions and by using the power of attorney, and sold plaintiff's 500 shares of Consolidated Steel and with its proceeds purchased 3500 shares of Exeter Oil and 1000 shares of Electrical Musical Industries, which last mentioned shares were to be held as security by the broker for the unpaid balance; that subsequently defendant had 500 shares of the Exeter Oil Company withdrawn from plaintiff's account and deposited to Marie Mullaney's account; that on February 4, 1939, plaintiff was advised of this brokerage account through a demand upon her by the broker to pay a portion of the unpaid balance on said stock or he would sell it to satisfy the unpaid balance; that in order to salvage a portion of the property purchased with the proceeds of the Consolidated Steel Company stock, plaintiff sold sufficient shares to satisfy the unpaid balance.

The answer of Marie Mullaney denied, on information and belief, the allegations of the amended complaint.

Defendant George J. Mullaney's answer to the amended complaint, among other denials and allegations, denied that Agnes Mullaney deeded all the real property to the parties in equal proportions and alleged that on November 5, 1928, she signed, acknowledged "and delivered" a deed to Parcel 1, conveying one-half to defendant and one-fourth each to plaintiff and Marie Mullaney; admitted he sold the 2½ per cent landowner's royalty and refused to deliver one-third to plaintiff, alleging she was entitled to only one-fourth thereof; admitted he recorded a certificate of stock in plaintiff's name on the books of the Union Oil Company, subsequently transferred and sold same, alleging that the stocks were placed in plaintiff's name "without consideration and merely for convenience"; admitted he opened the brokerage account, transferred 500 shares of Consolidated Steel to plaintiff, and subsequently sold said stock for $7,204.85, of which sum he invested $6,350.00 cash in 1000 shares of Electrical Musical Industries; that he then purchased "on margin" 3500 shares of stock of Exeter Oil Company and deposited the 1000 shares of Electrical Musical Industries, together with $894.95 cash, as security for said purchase; that the market price of both stocks decreased and the Electrical Musical Industries stock was insufficient security for the Exeter Oil Company stock purchased on margin, and it became necessary for him to

purchase 500 shares of said Exeter Oil Company and deposit $200 in cash of his own funds as well as to personally guarantee the remaining 3000 shares of Exeter Oil Company; that through his acts plaintiff became the owner of 1000 shares of Electrical Musical Industries, 3000 shares of Exeter Oil Company stock and 545 shares of stock in Exeter Refining Company, which last mentioned shares were stock dividends declared by Exeter Oil Company in December, 1937; that plaintiff ratified the acts of defendant when she made certain sales from this account and is estopped from complaining thereof. As a second defense, he alleged he paid plaintiff "more than she was entitled to receive." His third defense alleged that his written acknowledgments with reference to plaintiff's alleged interest in Parcel 1, in the proceeds of oil and gas produced therefrom, and in all the personal property belonging to their mother, were made without consideration.

The findings of the court were, in the main, in accord with the allegations and averments of the complaint. The case is before us on a bill of exceptions wherein the testimony set forth is somewhat meagre, but contains therein many of the plaintiff's exhibits, numbered 1 to 40, and defendant's exhibits, numbered A to Z and "AA."

As one of the grounds for reversal, defendants urge that the findings, conclusions and judgment that plaintiff was entitled (a) to one-third of the landowner's royalty and (b) to one-third of the proceeds from the sale of the $2\frac{1}{2}$ per cent landowner's royalty are contrary to the evidence and law. The court found that on April 24, 1936, George Mullaney recorded the deed to Parcel 1 and informed the plaintiff that the property had been transferred to plaintiff and defendants. At that time and thereafter George J. Mullaney stated to plaintiff in writing that one-third of said real property and one-third of the rents and profits thereof belonged to plaintiff, one-third to Marie Mullaney, and one-third to himself. Upon the mother's death, and until the institution of suit herein, George J. Mullaney collected the oil royalties from said real property and distributed them, except as to $153.81, one-third to each of them, pursuant to a written statement and promise that one-third of said royalties belonged to plaintiff and one-third each to Marie Mullaney and defendant; that on March 1, 1936, George J. Mullaney sold a 5 per cent landowner's royalty on Parcel 1 and forwarded to plaintiff in England

one-third of the proceeds; that on January 30, 1937, he sold an additional 2½ per cent landowner's royalty for $10,000; that said defendant acknowledged in writing, prior to and after the receipt of said sum, that one-third belonged to plaintiff and it was being held by him for plaintiff, subject to her further desire and direction; upon plaintiff's demand said defendant refused to deliver her one-third interest and converted it to his own use and benefit.

The court concluded from these findings that plaintiff was entitled to (1) recover $3,225, with interest, from George J. Mullaney because of the conversion of the proceeds from the 2½ per cent landowner's royalty sale and (2) to a judgment providing that plaintiff was entitled to the net income permanently from Parcel 1.

■ We believe that the findings are fully supported by the evidence and the inferences reasonably deducible therefrom. George testified, regarding the landowner's royalty transaction, that he sold a 5 per cent royalty interest on Parcel 1 for $24,000 and later a 2½ per cent for $10,000; that he never sent plaintiff any of the money received from the 2½ per cent royalty sale; that he did not pay any of the royalties received for the months of December, 1936 and January, 1937, out of the money received from the lessee, Gilmore, but that he did pay said royalties out of other moneys, but he could not say from just what income the moneys were received; that in October, 1937, plaintiff received one-third of the royalty check and has received one-third of all other royalty checks received since that time because the royalty checks were made payable to all three and plaintiff refused to endorse the checks unless she received one-third; that the deed to the oil land, Parcel 1, was delivered to him by his mother, was kept in his safe deposit box and recorded April 24, 1936; that he has known since 1926 that there was oil on the property; that he did not tell plaintiff that the deed to the oil property gave him one-half and his sisters one-quarter each until the present action was filed; that in November, 1937, he burned all his mother's cancelled checks, but on cross-examination he did not remember whether the cancelled checks were burned prior to plaintiff making a request for accounting. Defendant identified certain letters as those he had written and mailed to plaintiff while she was in London, which letters were received in evidence as plaintiff's exhibits. Only the pertinent parts of several of these exhibits are set forth herein:

(a) Typewritten letter, dated April 20, 1936, containing typewritten initials "G. J. M." at the end: ". . . there isn't very much of the estate left but what little there is *I thought we should have* and Ma wanted to put the ranches and house in our names before she ever got sick at all. . . . We don't need any attorneys to look after our enormous holdings but if this is the way you want it, you can have all you want for your third. . . . Ma wanted to put them in our name so that in case anything did ever happen to her that they would not have to be probated. . . . *I have no idea of gyping you, as you are entitled to as much as I am, one-third, and one-third rightfully belongs to Marie, the same as it does to you and I.* I wanted your power of attorney so that you wouldn't be troubled with the bills, taxes, bond assessments and other expenses that come with them. . . . However, *I didn't see anything to your debits* if the property was put in our names. . . . I hope I haven't insulted you or got you sore, as after all, *in all matters I think I am doing what is best for you.* . . ." (Emphasis added.)

(b) Typewritten letter, dated August 6, 1936, containing typewritten initials "G. J. M." at the end: *"I'll do whatever you say with your third* (and not pressing the fact, but you already got your third out of the grand) don't want to intimidate myself or influence you, but I think I could invest the amounts to advantage *but you will have to say so first.* Otherwise, *I'll just take your third* and put it in your account at the Wilshire-Western Branch of the Bank of America. . . . I can sell the rest of our percents at the same price but I think we have sold enough." (Emphasis added.)

(c) Typewritten letter, written in October, 1936, containing typewritten initials "G. J. M." at the end: "I was kind of surprised to get the second payment of the royalty dough last Thursday . . . so as per your instructions *I sent you your third of it* ($1600.00) and through the same bank. . . . How does it suit you if we split this, or these checks four ways . . . and the other fourth, or Ma's part we'll use for running the house? . . ." (Emphasis added.)

(d) Letter, dated February 25, 1937, containing no signature or initials: "This is 1100 berries and I am sending you two more envelopes registered at different times so that all three will make Wednesday's Normandie as I cabled you. . . . I am sending two more letters, one with 1100 more and the

other with 1000 making a total of 3200 or two $1600.00 payments, the last two out of the 5 per cent I sold at 5000 each percentage less 1000 for the commission & escrow & permit charges. . . . Instead of making money for you as I could if you gave me a chance, I was trying to save you paying out half of it to get it. But *its yours & I had it put aside for you awaiting your orders* & the cable today for the Dec. & Jan. checks. Can't send you them as I haven't got them yet, but *will instruct Gilmore to mail you your third* of the amount and copy of the run sheets and mail it to you every month.'' (Emphasis added.)

(e) Letter dated February 27, 1937, not signed or initialed: ``. . . All the estate consists of is 600 bucks in one bank and 1500 cash in another and one mortgage that isn't assigned, *the rest of the stuff I transferred last spring,* about the first of May *into all three of our names.* . . . I have the copies of all the run sheets and when Gilmore releases the Jan. Dec. & rest of the checks, *I'll have them mail you your third directly* with a copy of the run sheets for you, if you want it that way. *I'd rather have it that way and then theres no chance of you not getting your third.* I have a chance to sell 2½ per cent more than 10,000 and that would leave *us* six per cent, but I don't know what to do with the cash. I could have yours working to good advantage as I have Marie's and mine, but that I told you was up to you, *& since you didn't instruct me to invest it, or put it to work I just left it in the bank.* . . . *Well, it is your dough & you can do with it what you want.*'' (Emphasis added.)

(f) Letter dated March 1, 1937, not signed or initialed: ``The administrator is allowed so much by the court and the attorney so much too. Of course I'll take what they allow me, as it is exempt from taxes, *but I, of course, will divy it up three ways as I have done with everything.* . . . The places in Bakersfield and the place in Pasadena was deeded to us in 1928, and I didn't record the deeds until April of last year. . . . There was some Union Oil Stock, some Consolidated Steel and some Exeter Oil stock, *but I also fixed that up last April, and it is alright, divided three ways.* . . . I have the dividends and also the rents from the places on the ranch and the proceeds of our cotton rent from the ranch, all deposited in a special account that is now about 1200 berries; *and of course one-third of it is yours.* . . .'' (Emphasis added.)

Also identified by defendant was a copy of his 1937 federal

income tax return, which was admitted over his objection that it was an attempt to vary the terms of the deed to Parcel 1, containing a statement that he had sold certain landowner's royalties in which he had a one-third interest. He further identified a copy of Marie Mullaney's 1936 California income tax return and testified that the writing on the copy was his writing, to wit: ''Sale of one-third interest in 5 per cent landowner's royalty from oil land 6400.'' The defendant was then shown the California inheritance tax department's report, on file in his mother's estate, which report showed the inheritance tax department's opinion of the value of the estate each of the heirs was to receive, to wit, an undivided one-third interest in and to the oil and gas lease on said Parcel 1.

George J. Mullaney contends that the statements contained in his letters do not create a trust because they do not evince an intent to create a trust; that they are simply statements of past events. Plaintiff, on the other hand, claims that she is not attacking the validity of the deed to Parcel 1, but maintains that these letters establish the fact that defendant intended to and did create a trust in one-third of the property left by their mother, whether probated or not, and that defendant is now estopped to deny her one-third ownership.

■ Despite the informality of the language, we believe the letters initialed by defendant sufficiently disclose a trust intent. It is well settled that no particular language or terminology is necessary to create a trust; nor need the word ''trust'' or ''trustee'' be used; nor need all the conditions of the trust be expressed in a single paper; nor need a trust in personal property be in writing. (*Luco* v. *De Toro*, (1891) 91 Cal. 405, 417 [18 P. 866, 27 P. 1082]; *Booth* v. *Oakland Bank of Savings*, (1898) 122 Cal. 19, 24 [54 P. 370]; *Root* v. *Kuhn*, (1921) 51 Cal.App. 600, 604 [197 P. 150]; *Hellman* v. *McWilliams*, (1886) 70 Cal. 449, 452 [11 P. 659]; Civ. Code, sec. 1052.) ■ A trust, whether of real or personal property, is created ''as to the trustor and beneficiary, by any words or acts of the trustor, indicating with reasonable certainty: 1. An intention on the part of the trustor to create a trust, and, 2. The subject, purpose and beneficiary of the trust.'' (Civ. Code, sec. 2221.) There is a concurrence of these elements so as to indicate with reasonable certainty that a trust was created by defendant and so intended by him. There was nothing equivocal or vague in defendant's statements of his

intention when he said, "I have no idea of gyping you, as you are entitled to as much as I am, one-third, and one-third rightfully belongs to Marie, the same as it does to you and I." The subject of the trust was all the property of which their mother had been seized during her lifetime; the purpose was to acknowledge a one-third interest in the beneficiaries, to wit, plaintiff and her sister Marie. Not only is defendant's intention to create a trust evident by his declarations, but his subsequent acts in forwarding one-third of the 5 per cent royalty sale and royalties from Parcel 1, and otherwise dealing with the other property as though one-third belonged to plaintiff, establish beyond reasonable certainty his intent. In *Lynch* v. *Rooney*, (1896) 112 Cal. 279, 283-4 [44 P. 565], the following declaration in a letter was held to create a trust: "My Dear Aunt: . . . Some time after Uncle Bryan's property was deeded to me I heard that Uncle Patrick was still living, and I resolved that he should have half of the estate, though the laws does not compel the division. . . . Your affectionate niece, Mary Rooney." The court, at page 285, states: "Upon a careful consideration of this letter, we are satisfied that an intention upon the part of Mary Rooney to create and declare a trust appears therefrom with reasonable certainty. The subject of the trust is disclosed by the letter to be the land. The purpose is to acknowledge an undivided interest therein in fee in the beneficiaries, and the beneficiaries are the heirs of Patrick Lynch, deceased. . . . When Mary Rooney wrote this letter she recognized the fact that a moral obligation rested upon her to give the heirs of Patrick Lynch that portion of the estate which would have gone to him by the decree of distribution, if Mary had known that he was then in life; and it was to satisfy this moral obligation resting upon her, that, as an honest woman, she desired Patrick's heirs to have his interest in the estate. She declared this trust for that reason, and with that end in view. . . ."

The next point raised by the defendants is that the letters, insofar as they relate to the landowner's royalty or percent, are not sufficiently "subscribed" to come within the provisions of section 852 of the Civil Code, because some of the letters contain only initials and others are not signed at all. Section 852 of the Civil Code provides that "No trust in relation to real property is valid unless created or declared: 1. By a written instrument, subscribed by the trustee, or by his agent thereto authorized by writing; . . ." That a

landowner's royalty or percent is an "interest in real property" is now well settled in California. (*Callahan* v. *Martin*, (1935) 3 Cal.2d 110 [43 P.2d 788, 101 A.L.R. 871]; *Dabney* v. *Edwards*, (1935) 5 Cal.2d 1 [53 P.2d 962, 103 A.L.R. 822]; *Standard Oil* v. *J. P. Mills Organization*, (1935) 3 Cal.2d 128 [43 P.2d 797].) ▮ This being true, have defendant's letters been "subscribed" within the purport of section 852 of the Civil Code when they contain only his initials? We have under consideration personal letters between a brother and sister written during a period when there was considerable affection between them. It is not unusual to find in such letters that the full name has been omitted in the signature and in its place has been substituted only the given name, an abbreviated name, a humorous pet name, and sometimes even initials. The defendant does not deny writing the letters; his complaint is that the initials are an insufficient subscription. While he used his initials only, we cannot say that he entirely omitted his name, he merely abbreviated it and used a combination of letters which were part of his full name. The initials having been placed at the end of the letters, the accepted place for a signature, it is difficult to arrive at any other conclusion but that they were *meant* by him to be his signature and to thus identify himself in his letters. In *In Re Walker*, (1895) 110 Cal. 387 [42 P. 815, 52 Am.St.Rep. 104, 30 L.R.A. 460], in discussing the words "subscribe" and "sign," the court uses this language (p. 391-2): "It will be noted in the section of the code above quoted that the duty enjoined upon the testator is to subscribe the will, while that imposed upon the attesting witnesses is that each must sign *his name as a witness*. The difference is neither immaterial nor accidental. A testator may be illiterate, or he may by reason of paralysis, or other disabling cause, be incapacitated from signing his name, and the law has wisely and liberally provided for the due execution of a will by one so situated. It has required of him that he shall subscribe, and, while the word unquestionably has for one of its significations the signing of a name, it is a verb of comprehensive meaning. Any form or kind of underwriting is a subscription, and generally it has been held that any mark or writing by the testator meant by him to be his name, or to take the place of his signature, or to serve for his identification, will answer the requirements of a statute which calls merely for subscrip-

tion or signing. The same liberality of construction and interpretation has been put by the courts upon statutes which require the witnesses merely to subscribe or to sign. There are thus numerous cases under such statutes which hold, in effect, that any signing by which alone or by which, aided by parol evidence, the identity of the subscriber may be ascertained, substantially complies with the statute." And again, at p. 393: "To *subscribe* is to attest or give consent or evidence knowledge by underwriting, usually (but not necessarily) the name of the subscriber. . . . To *sign,* in the primary sense of the word, is to make any mark." In *Estate of Manchester,* (1917) 174 Cal. 417, 421 [163 P. 358, Ann.Cas. 1918B. 227], the court states: "The declarations in these cases are entirely consistent with the rule stated in *Estate of Walker* [*supra*], that 'To sign an instrument or document is to make any mark upon it in token of knowledge, approval, acceptance, or obligation. The signature is the sign thus made.' . . . The true rule, as we conceive it to be, is that, wherever placed, the fact that it was intended as an executing signature must satisfactorily appear on the face of the document itself. If it is at the end of the document, the universal custom of mankind forces the conclusion that it was appended as an execution, if nothing to the contrary appears."

As in all cases where the intent is the test, there can be no hard and fast legal rule as to form. The statute here required that the instrument be "subscribed," and what shall constitute a subscription must be determined in each case by the circumstances. Where, as in the instant case, defendant does not deny writing the letters, subsequently conducts himself in accord with the many declarations in his letters, and adopts the use of his initials "G. J. M." as a signature when also writing to his sister Marie, we can but conclude that he intended his initials to constitute his signature. Signature by initials has been held to be sufficient under the statute of frauds and the statute of wills. ▮ The fact that some of the letters in this case were typewritten rather than handwritten by defendant does not alter the situation. An instrument is deemed signed although the signature is typed, lithographed, rubber-stamped or printed. The foregoing methods of signature have been sustained in many cases. (*People* v. *Brussel,* (1932) 122 Cal.App.Supp. 785, 789 [7 P.2d 403] (rubber stamp signature); *Allenberg* v. *Rapken & Co., Ltd.,* (1930) 108 Cal.App. 99 [291 P. 281] (rubber stamp signa-

ture); *O'Neil* v. *Brode,* (1919) 40 Cal.App. 371 [181 P. 91] (rubber stamp signature); *Hewell* v. *Hogin,* (1906) 3 Cal.App. 248, 254 [84 P. 1002] (lithographic signature); *Ligare* v. *California S. R. R. Co.,* (1888) 76 Cal. 610 [18 P. 777] (printed signature); *Williams* v. *McDonald,* (1881) 58 Cal. 527 (printed signature).)

Defendants contend further (a) that the findings and judgment awarding plaintiff damages arising out of the operation of the brokerage account are contrary to the law and evidence, (b) that plaintiff's conduct in revoking the power of attorney and personally taking over the account amounted to a ratification, and (c) that the court erred in failing to find on the issue raised by defendant's answer that he transferred the 500 shares of Consolidated Steel to plaintiff without consideration.

The court found that plaintiff, while absent from this country, executed a power of attorney upon defendant's representations that he would protect her interests and he was instructed not to use the power of attorney in stock market speculations; that Agnes Mullaney assigned and transferred to plaintiff and each of the defendants one-third of the 1500 shares of Consolidated Steel stock owned by her; that George Mullaney used the power of attorney, contrary to plaintiff's instructions, to open a brokerage account for her, sold her 500 shares of Consolidated Steel for $7,204.85, and then purchased 3500 shares of Exeter Oil Company stock and 1000 shares of Musical Industries, authorizing the broker to hold said shares as security for the unpaid balance of $2,201.12 remaining due on the purchase price after applying all the proceeds received from the sale of the 500 shares of Consolidated Steel; that subsequently defendant directed 500 shares of the Exeter Oil to be withdrawn from the brokerage account and deposited to the account of Marie Mullaney; that on February 4, 1939, plaintiff was advised of the brokerage account when demand was made upon her by the broker to pay an unpaid balance or he would sell the stock to satisfy the balance; that plaintiff, solely for the purpose of salvaging a portion of the property purchased with the proceeds of the Consolidated Steel, sold sufficient shares of stock to satisfy the unpaid balance; that after deducting the proceeds of said sale there remained in said account 1400 shares of Exeter Oil Company stock, of the value of $525, and the sum of $811.01 cash;

that plaintiff was damaged in the sum of $5,868.84 by reason of the sale and conversion of the 500 shares of Consolidated Steel stock, after deducting from the proceeds of the sale the reasonable value of the shares of stock and cash remaining in the account.

Plaintiff's testimony was to the effect that while she trusted her brother she wrote him not to invest her money and to put it in the bank; that during 1937 and 1938 she received money from defendant upon her request; that thereafter he refused to give her money, stating that it was gone, he having lost it in the stock market; that in 1936 her mother told her that she owned Consolidated Steel stock; that in July, 1937, she and her husband were going to Santa Barbara and she asked George what stocks she owned and he listed them on a slip of paper, which was introduced in evidence and reads:

```
"184 Union Oil 4336.00
 500 Con. Steel 7500.00
1000 E. M. I. @ 6¼
2000 Exeter 92½ — 1.05"
```

Plaintiff further testified that in January, 1938, she first learned of the brokerage account when she received an interest slip; that defendant told her not to worry about the account; that she revoked her power of attorney in June, 1938; that in January, 1939, she was advised by the broker that the account needed additional money to be properly margined; that she consulted her attorney and he advised her to sell only enough stock to cover the margin calls.

Defendant testified that he gave plaintiff the slip of paper above copied, that his mother gave him 1500 shares of Consolidated Steel [apparently indorsed in blank] and that he had 500 shares put into the name of each of his sisters "merely for convenience." At this point, his March 1, 1937, letter was introduced in evidence. It contained the following declaration: ". . . There was some Union Oil stock, some Consolidated Steel and some Exeter Oil stock, *but I also fixed that up last April, and it is alright, divided three ways. . . .*" (Emphasis added.)

The findings that Agnes Mullaney owned 1500 shares of Consolidated Steel stock and assigned and transferred one-third of this amount to plaintiff and that defendant directed the broker to sell the 500 shares of Consolidated Steel stock owned by plaintiff, are necessarily inconsistent with and therefore sufficient to dispose of defendant's allegation in

his answer that defendant transferred these shares to plaintiff without consideration. Findings are liberally construed in support of the judgment.

These findings are supported by the evidence above reviewed. George admitted that his mother endorsed and delivered to him her Consolidated Steel stock. The trial court was not bound to accept his testimony that she gave him no instructions when she did so, and that plaintiff had no interest in this stock, but might infer from the slip of paper he gave plaintiff, the letter he wrote to plaintiff, and his acts in having the certificate for 500 shares issued in plaintiff's name, that his mother had directed him to do so.

The case of *Griffin* v. *Payne,* (1933) 133 Cal.App. 363 [24 P.2d 370], cited by defendant in support of his contention that plaintiff ratified his acts when she took over the account, is not applicable to the situation in the case at bar. Payne was informed the same day the stocks were purchased and had subsequent notices, but waited until after the market value of the stock had decreased before he made objections to the purchases. There the court properly held that he ratified the purchases. Not so, in the instant case. Here, defendant failed to make a full disclosure of the facts surrounding the stock transactions and when plaintiff finally learned the true situation, after having been misled by defendant, it was no longer within her power to rescind the transaction and her only recourse was to salvage what stocks were left on hand. Such action on her part cannot be said to amount to an exonerating ratification. We believe the conclusion reached in *Pacific Vinegar etc. Works* v. *Smith,* (1907) 152 Cal. 507, 511, 512 [93 P. 85], is controlling in the instant case. There the court used the following language: "But upon a moment's reflection it will become apparent that the reason for applying the rule in all its liberality to innocent third persons does not exist in the same broad and benignant sense to the unwarranted and perhaps unlawful act of the agent. Thus, in many instances, the transaction is one which the principal could not rescind, because of the ostensible power of his agent. The innocent third party is thus fully protected. But can it with reason or justice be said that because the principal is thus compelled to accept the consideration from the innocent third party, the agent himself must of necessity be held harmless for his violation of duty and breach of trust? If an agent

with ostensible authority to sell his principal's wheat, but under instructions to sell it for not less than a dollar a bushel, shall sell and deliver it for fifty cents a bushel, there is no power in the principal to rescind the sale. Shall the principal by accepting the fifty cents be held to have exonerated his agent from liability for the other fifty cents per bushel? Such a doctrine certainly does not commend itself and is not sustained. It is limited, so far as the agent is concerned, to those cases where there remains with the principal, after his first complete knowledge of the transaction, the power to rescind, and failing so to do he is properly charged with full acceptance of all the responsibilities of the contract, even to the exoneration of his agent, because, with the ability to rescind, if he had rescinded, the transaction would be at an end and nobody would be injured. But in a case such as the one here presented it cannot successfully be contended that the acts of the plaintiff in endeavoring to realize upon the notes of the insolvent corporation, taken and indorsed by Smith in violation of his instructions, could amount, as to him, to an exonerating ratification . . . it was not only the right but it was the duty of the plaintiff to realize as much as it could upon the notes thus improperly taken by its president, not to the end that he should be relieved from responsibility for the differences, but to the very end that by using every endeavor to realize upon the notes, the agent's liability by way of damage could be accurately estimated in terms of that difference.''

 George was never authorized to sell or deal in stocks for plaintiff; to the contrary, he was specifically instructed not to do so, and his action in so doing constituted a violation of his duty and breach of trust for which he is liable. (*Pacific Vinegar etc. Works* v. *Smith, supra; Corbett* v. *Benioff,* (1932) 126 Cal.App. 772, 776 [14 P.2d 1028].) In this connection, he argues that plaintiff cannot accept the benefits, i. e. the increased price of Consolidated Steel shares and decline the losses incurred in the purchase of other securities. This argument is untenable. An agent may not ''do any act which a trustee is forbidden to do.'' (Civ. Code, sec. 2322; *Calmon* v. *Sarraille,* (1904) 142 Cal. 638, 641 [76 P. 486]; *Smith* v. *Elderton,* (1911) 16 Cal.App 424 [117 P. 563].) And ''in all matters connected with his trust, a trustee is bound to act in the highest good faith toward his beneficiary, and may not obtain any advantage therein over the latter by the slightest misrepresentation, concealment, threat, or adverse pressure of

any kind'' (Civ. Code, sec. 2228). "A trustee may not use or deal with the trust property for his own profit, or for any other purpose unconnected with the trust, in any manner'' (Civ. Code, sec. 2229). "A trustee who uses or disposes of the trust property . . . may, at the option of the beneficiary, be required to account for all profits so made . . . and, if he has disposed thereof, to replace it, with its fruits, or to account for its proceeds with interest.'' (Civ. Code, sec. 2237; Rest. Trusts, sec. 208, 210, 213; *Gray* v. *Yarbrough*, (1923) 61 Cal. App. 724, 730 [215 P. 914] ; *Corbett* v. *Benioff, supra*.) In the Corbett case the appellants likewise argued that "respondents must ratify the transaction as a whole or repudiate it as a whole. They cannot accept its benefits and reject its burdens,'' and the court responded: "The point which appellants endeavor to make is that the sale of the stock of the Los Angeles First National Bank and the purchase of the stock of General Motors was a single transaction and that respondents have ratified the sale by claiming the proceeds thereof and repudiated the purchase. It is a sufficient answer to state that respondents have never ratified either the sale or the purchase. Both were unauthorized and respondents are merely claiming the amount of the proceeds of the unauthorized sale as the measure of the liability of appellants for the breach of trust.'' Under the foregoing authorities, it seems clear that plaintiff was entitled to a judgment on this item against defendant for the sum of $5,868.84 with interest.

It appears from plaintiff's testimony that she first knew of the brokerage account in January, 1938, and she then went to the broker regarding the account. We must accept this statement rather than defendant's testimony that he told her of it in 1937. What she learned from the broker at this time the record does not show, but in view of her other testimony regarding the instructions she gave defendant—instructions which this account violated—she was put upon inquiry at this time and charged with notice of all that an inquiry would have disclosed. Hence we cannot deal with the case on the assumption that she remained ignorant of the facts regarding the account after January, 1938. Defendant contends that she should at that time have closed out the account, and that, even if she may hold him for damages according to the rule above stated, she cannot recover anything on account of depreciation after that time of the stocks then in the account.

We incline to the view that plaintiff should have acted without unnecessary delay after she discovered or should have discovered the facts regarding this account, allowing her, of course, a reasonable time for action after discovery, actual or imputed. She could not wait and hold defendant for subsequent decreases in value of the stocks in the account. But we find no evidence in the record regarding any such decrease in value, except perhaps the broker's letter to plaintiff of January 24, 1939, calling for an additional margin of $75 because of "the drop in the last two days in market prices." At the trial the values of the stocks in this account were stipulated, without any specification of the dates to which the values were applicable, and we have no basis for an inference that these values changed at any time. Plaintiff made a prima facie case by showing the amount received for the Consolidated Steel stock and the value of the stocks and money in the account when she should reasonably have acted in regard to it; if any change thereafter and before she did act would have affected the amount of her damages, the defendant should have offered evidence regarding it.

Defendants claim that the court erred in granting plaintiff judgment because of the conversion of 184 shares of Union Oil stock and in failing to find on the issues raised by his answer that the stock was placed in plaintiff's name "without consideration and for convenience only." His contention is that plaintiff never owned this stock and that this allegation of the answer was shown to be true.

The findings of the court on this subject are: That Agnes Mullaney in her lifetime owned 704 shares of Union Oil stock; that prior to her death she assigned 184 shares of Union Oil stock to plaintiff and on May 6, 1936, defendant caused said shares to be recorded on the books of the Union Oil Co. in plaintiff's name and a certificate to be issued in her name therefor; that later, by the use of his power of attorney from plaintiff and without plaintiff's consent or knowledge and without authority, defendant caused these shares to be transferred to himself, sold them and converted the proceeds to his own use; and that "by reason of the conversion of said shares of stock, as aforesaid" plaintiff has been damaged in the amount of the judgment. In support of this finding there is testimony from an assistant secretary of Union Oil Company, who produced the certificates for 368 shares originally belonging to Agnes Mullaney, attached to which was an assign-

ment of 184 shares to plaintiff and 184 shares to Marie E. Mullaney, signed by Agnes Mullaney, and who testified that a new certificate in the name of plaintiff was issued for 184 shares and mailed to defendant in May, 1936, and later receipted for by him and that in May, 1937, these shares were transferred to defendant on an assignment of the certificate signed by him as plaintiff's agent, accompanied by a power of attorney from plaintiff to defendant dated July 7, 1936, empowering him to act for her in such matters. This evidence, with the inferences to be drawn from it, is sufficient to support the findings above mentioned. ▮ Defendant claims that no valid delivery of the certificate to plaintiff is shown thereby. It is true, no manual tradition to her of the stock certificates assigned by Agnes Mullaney, or of the new certificate issued to plaintiff, is shown. But it is apparent from all the evidence above recited, that defendant, even before the execution of plaintiff's power of attorney, was acting for plaintiff, in all matters relating to the disposition and handling of their mother's property, and hence the delivery to him was a sufficient delivery to pass title to plaintiff. It is true, the defendant gave testimony from which a contrary inference could be drawn, but the trial court was not bound to believe him and evidently did not do so. Its decision in this respect is binding upon us. ▮ The court did not make an express finding on the allegation of defendant's answer that this Union Oil stock ''was placed in the name of plaintiff by defendant without consideration merely for convenience.'' But, as we have already stated, findings are to be liberally construed in support of the judgment. The findings above mentioned, that Agnes Mullaney owned these shares of stock and assigned them to plaintiff and that defendant without authority transferred them to himself are so necessarily inconsistent with defendant's allegation as to amount to a negation thereof.

▮ Defendants urge that the part of the judgment awarding plaintiff 1666 shares of Laguna Land & Water Co. stock or its value of $149.94 is against the evidence. Defendant testified that his mother owned 5000 shares of this stock, which was transferred into his name, and that he still had all of said stock. His declarations in his letters to plaintiff, impeach this testimony, and the court was entitled to believe the assertions that ''everything was being divided three-ways,'' and

to find that one-third of the stocks, or 1666 shares, or its proceeds, belonged to plaintiff.

Defendants further urge that the court erred in granting plaintiff $1000 for the alleged conversion of 5000 shares of Mt. Diablo stock. George testified that 6280 shares of Mt. Diablo stock were owned by his mother and that she turned over the stock to him; that he sold it for $3000 after her death. The testimony is clear that this stock was never given to defendant as his sole and separate property; it was merely turned over to him, he sold it and pocketed the proceeds. The court properly found in accordance with George's declarations that the property was being divided three ways, and that one-third belonged to plaintiff.

As to defendant's contention that the court erred in holding that Agnes Mullaney and the parties hereto agreed that during the lifetime of Agnes Mullaney the income from Parcel 1 should be divided in equal parts between Agnes Mullaney and the parties hereto, we direct attention to defendant's letter of October, 1936. This finding is not vital, but other evidence also supports this finding.

Judgment affirmed.

Shinn, Acting P. J., Wood (Parker), J., and Shaw, J. pro tem.

Appellants' petition for a hearing by the Supreme Court was denied September 1, 1943. Gibson, C. J., voted for a hearing.