DRI-POWR DISTRIBUTORS ASSOCIATION TRUST, MACK RICHKIND, TRUSTEE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

CLARENCE M. WYNN AND EVELYN B. WYNN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5360–67, 5386–67.   Filed March 11, 1970.

*Robert M. Barton*, *William M. Pfeiffer*, and *Richard L. Noble*, for the petitioner in docket No. 5360–67.

*Scott McCormac*, for the petitioners in docket No. 5386–67.

*Paul G. Wilson*, for the respondent.

468

472

OPINION

*Issue 1. Taxability of the Trust Contributions to Wynn*

Respondent argues that the distributors' contributions to the trust during the period from January 1, 1962, to April 1, 1963, are taxable to Wynn as "Gross income derived from business" within the meaning of section 61(a)(2).[2] Wynn contends that, if the trust funds constitute income to anyone, then they are income to the trust rather than himself.

In support of his position that the trust contributions are taxable to Wynn, respondent mounts a two-pronged offensive. First, he contends that Wynn's sole proprietorship received the trust contributions under a claim of right and without restriction as to the disposition thereof, invoking the rule of *North American Oil* v. *Burnet*, 286 U.S. 417 (1932). We cannot agree. In our view the claim-of-right doctrine has no proper application to the case at bar.

In order to explain fully the *ratio decidendi* compelling this conclusion, it becomes appropriate for us to consider the landmark case of *North American Oil* v. *Burnet, supra.* The facts of that case are that the United States held the legal title and claimed beneficial rights in various oil properties being operated by the taxpayer oil company. In 1916, during the course of proceedings instituted by the Government before the District Court to oust the company from possession of the oil lands, a receiver was appointed to operate such property and hold the net income derived therefrom. The Government's action was dismissed by the District Court in 1917, and in that year the net profits for 1916 were paid by the receiver to the taxpayer. The Court of Appeals affirmed the lower court decision in 1920, and a further Government appeal to the Supreme Court was dismissed by stipulation in 1922.

The taxpayer reported the net profits paid to it by the receiver in an amended return for 1916. The Commissioner determined a deficiency on the basis that the net profits were taxable for the year 1917. The

---

[2] SEC. 61. GROSS INCOME DEFINED.

(a) GENERAL DEFINITION.—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items :

\*          \*          \*          \*          \*          \*          \*

(2) Gross income derived from business ;

taxpayer contended that the profits were properly reported in 1916, or alternatively should have been reported in 1922. It was conceded by the parties that the net profits constituted income to the taxpayer so that the only question for decision concerned the appropriate year of inclusion. The Supreme Court held that the profits were not reportable in 1916 since at that time they had not been received and might never be received by the taxpayer. The Court said that there was no constructive receipt of the profits in 1916 "because at no time during the year was there a right in the company to demand that the receiver pay over the money." The Court further held that the profits were taxable in 1917 and not in 1922, inasmuch as it was 1917 when the company "first became entitled to them and when it actually received them." Justice Brandeis, delivering the opinion for the Court, then enunciated the oft-quoted claim-of-right rule:

If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent. * * * [Citations omitted.]

At the outset, we note that the focus of the *North American Oil* case was on the narrow question of *when* income is reportable. *Equitable Life Insurance Co. of Iowa* v. *United States*, 340 F. 2d 9, 14–15 (C.A. 8, 1965); and *Growers Credit Corporation*, 33 T.C. 981, 998 (1960). The question before us here is *whether* the trust receipts are income, and if so, *who* is the proper taxpayer. Hence, it would seem that the claim-of-right doctrine is entirely inapposite to the issue at hand. Nevertheless, some court decisions can be read as extending the scope of this judicial doctrine beyond its original perimetry. See Lister, "The Use and Abuse of Pragmatism: The Judicial Doctrine of Claim of Right," 21 Tax L. Rev. 263 (1966). Therefore, we shall proceed to apply the elements of the doctrine to the facts of this case.

The following prerequisite elements must be shown before the claim-of-right doctrine becomes operative: (1) The taxpayer must receive income; (2) under a claim of right; and (3) without restriction as to its disposition. These fundamental factors have been present in those instances where this Court has seen fit to invoke the doctrine. See for example *Bramlette Building Corp.*, 52 T.C. 200, 206 (1969), on appeal (C.A. 5, June 5, 1969); *Fort Hamilton Manor, Inc.*, 51 T.C. 707, 721 (1969); *Conlorez Corp.*, 51 T.C. 467, 471 (1968); *Ralph E. Wilson*, 40 T.C. 543, 548 (1963); and *Arthur L. Kniffen*, 39 T.C. 553, 569 (1962).

The facts of the instant case simply do not fall within the mold required to trigger the operation of the claim-of-right doctrine. First, assuming *arguendo* that the trust contributions can be characterized

as income, it is not at all clear that either Wynn or the company *received* same. Respondent stresses the fact that the distributors made out a single check to the company covering both the Dri-Powr merchandise cost and the trust contribution, and that such check was endorsed by the company. However, the facts also show that immediately upon receipt of a distributor's check with a purchase order, certain Dri-Powr employees designated by Richkind would calculate the amounts due the company and the trust respectively in accordance with the information shown on the current price sheet, which sheet showed in separate columns the cost due the company for its merchandise and the contribution the distributors independently agreed should be made to the trust. The appropriate journal entries were then made on the separate books of the company and the trust, and duplicate deposit slips were prepared showing the respective amounts to be credited to the separate accounts of the company and the trust. The bank then credited to the company's account only that portion of the deposit representing the sales price of Dri-Powr merchandise, and then credited the balance representing the distributor's trust contribution directly to the trust's separate account. Thus, the amounts due the trust went directly from the distributor's checking account to the trust's bank account without ever passing through the company's account. In view of this, it is difficult for us to see how it can be said that Wynn or the company either actually or constructively received the distributors' contributions to the trust.

However this may be, it is patent in the record before us that Wynn never asserted a claim of right to the trust funds. As the Supreme Court said in *Healy* v. *Commissioner*, 345 U.S. 278, 282 (1953) : "There is a claim of right when funds are received and treated by a taxpayer as belonging to him." The record is barren of any evidence that Wynn ever treated the association's funds as belonging to himself or the company. Indeed, there is credible testimony from Richkind and the three Dri-Powr distributors that at no time did Wynn divert the trust funds to his own use or benefit or that of the company.

Finally, it naturally follows from the foregoing discussion that in our view Wynn did not have unfettered control over the disposition of the amounts in the trust. Respondent disputes this by pointing out that, while the total amount paid by the distributors during 1963 did not change, the portion thereof going to the trust increased during 1963 from 56 percent to 67 percent with the result that proportionately smaller percentages were being deposited in the company account. Respondent finds it inconceivable that the distributors could be unilaterally determining the percentage contributed to the trust when the practical effect was to reduce Wynn's profit margin on Dri-Powr

merchandise. However, Wynn gave a reasonable and credible answer to this when he testified that the company and corporation reduced its merchandise prices in 1963 when the sales volume of Dri-Powr products increased. Possibly, the token program increased Dri-Powr sales enabling Wynn and the corporation to reduce its profit margin per case of merchandise.

Respondent also intimates on brief that the distributors could not have known how much money was being allocated to the trust and the company, respectively. The facts belie this. The distributors prepared the purchase orders themselves from the price sheets which broke down the respective amounts due to the trust and the company. Moreover, the books and records of the company and the trust were open for the distributors' inspection. Also available to them were detailed schedules prepared by Richkind showing for each individual distributor the amount per transaction going to the company, the amount to the trust, and a further breakdown of the trust contribution showing the various sums for token redemption, freight, advertising, etc.

It follows from the foregoing discussion that we deem the Supreme Court's decision in *North American Oil* v. *Burnet, supra,* inapplicable to the facts herein.

The second prong of respondent's effort to include the distributors' contributions in Wynn's gross income is his argument that the trust lacks validity. He questions whether the declaration of trust is reasonably certain with respect to its material terms (e.g., as to the subject, purpose, and beneficiary of the trust) as required under local (California) law, citing *Simpson* v. *Simpson*, 80 Cal. 237, 22 Pac. 167 (1889), and Cal. Civ. Code secs. 2221, 2222 (West 1954). From the premise that a valid trust was never created, respondent reasons that it follows that the association's bank accounts were in reality nothing more than separate bank accounts maintained by the company as reserve funds for the payment of freight, advertising, and promotion expenses, and for the redemption of tokens contained in Dri-Powr merchandise.

In view of the convincing state of the record before us, we are constrained to take a contrary view. From 1940 when Wynn first began making agreements with various distributors until the date of trial, Wynn and subsequently the corporation had a standing requirement [3] that the distributors (who were independent contractors in business for themselves and not employees of Wynn or the corporation) must

---

[3] The only exception to this policy occurred when the association was in its embryonic form and the distributors were working out their differences with respect to the sharing of freight costs. During this period, Wynn, and later the corporation, consented to pay a portion of the freight costs of the out-of-State distributors (A distributors) and certain advertising costs.

pay for all freight, f.o.b. plant, and arrange and pay for all advertising and promotion of Dri-Powr products. This long-standing company policy provided the impetus for the distributors to band together and form the association to achieve the benefits of sharing freight costs and conducting a unified advertising campaign. To this end, the distributor members of the association opened their own separate bank account; set up a trust fund for the pooling of their funds; and requested Wynn to act as trustee of their fund. Upon being approached by the distributors regarding the token program proposal, Wynn asked to be relieved of his duties as trustee, and Richkind gradually became the distributors' choice to succeed Wynn as trustee.

The local distributors met weekly during the years in issue. Out-of-town distributors would only attend meetings once or twice a year, but were kept informed by Richkind and the distributors of the decision made by the other distributors in these meetings. The distributors determined the amounts that would be contributed to the trust and the purposes for which such contributions would be expended (e.g., freight, advertising, product promotion, and token redemption). Wynn, and later Richkind, administered the trust in accordance with the instructions of the distributors, and solely for the benefit of the association and its members.

Admittedly, the history and development of the trust was not quite as neat and tidy as the foregoing summary may suggest. The association did not have a formal minute book, or any formal setup of officers during the years involved herein. There was no written declaration of trust [4] and Wynn and Richkind were not formally elected or appointed by written document to assume the duties of trustee. Wynn and Richkind did not make a formal acceptance of the duties of trustee, but instead gradually assumed such duties through their words, acts, and course of conduct.

Nevertheless, we do not understand California law to require formalism as a precondition to the creation of a valid trust. The California courts have upheld the creation of a trust under immeasurably less formal circumstances. See *Weiner* v. *Mullaney*, 59 Cal. App. 2d 620, 140 P. 2d 704, 710–711 (1943) (intention to create a trust inferred from acts subsequent to an informal declaration); and *In Re Hovland's Estate*, 38 Cal. App. 2d 439, 101 P. 2d 500, 503–504 (1940) (intention to create trust inferred from course of conduct and surrounding cir-

---

[4] Respondent stresses the existence of a document entitled "Trustee-Trust Agreement" executed by Wynn and 25 distributors. He contends that pars. 4 and 8 (which are set forth in our Findings of Fact) of this instrument indicate that the company had more control over the trust than petitioners care to admit. However, the uncontroverted and credible testimony of the witnesses in this case was to the effect that this instrument was never put into operation, but instead the trust functioned in accordance with the words, acts, and course of conduct of the distributors and the trustee.

cumstances). Under California law, an express trust in personal property need not be in writing, but instead may be created, declared, or admitted verbally and may be proved by parol evidence. *Lefrooth* v. *Prentice*, 202 Cal. 215, 259 Pac. 947, 952 (1927); and Cal. Civ. Code sec. 2222 (West 1954). It also appears that formal appointment of a trustee is not necessary under California law inasmuch as section 2219 of the California Civil Code simply provides that "Every one who voluntarily assumes a relation of personal confidence with another is deemed a trustee." Furthermore, it is not necessary that the trustee specifically accept the terms of the trust for any act or conduct on his part which indicates with reasonable certainty that he understands and accepts the terms thereof is sufficient. *Cooper* v. *Cooper*, 3 Cal. App. 2d 154, 39 P. 2d 820, 823 (1934). Finally, as our earlier review of the facts surrounding the creation of the trust shows, there can be no question but that reasonable certainty was present as regards the material terms of the trust (i.e., the intention of the distributors to create a trust; Wynn's and Richkind's acceptance of the trust; and the subject, purpose, and beneficiary of the trust) in accordance with the provisions of sections 2221 and 2222 of the California Civil Code, which provisions are set forth in the margin.[5]

In essence, respondent's contention that the trust lacks validity asks us to view the trust as a sham and to attribute the distributors' contributions thereto to Wynn. To do so we would have to ignore the credible testimony of five witnesses (i.e., Wynn, Richkind, and three Dri-Powr distributors) to the effect that the trust was made of real substance. This we are not prepared to do. Painstaking perusal of the record convinces us that the trust was indeed a living, breathing, viable entity.

Based upon the foregoing, we hold that no portion of the amounts contributed by the distributors to the trust is includable in Wynn's gross income.

### *Issue 2. Taxability of the Trust Contributions to the Trust*

Respondent makes the alternative argument that if, as we have determined, the trust contributions are not income to Wynn, then a

---

[5] Sec. 2221. Voluntary trust; creation as to trustor and beneficiary

VOLUNTARY TRUST, HOW CREATED AS TO TRUSTOR. Subject to the provisions of Section 852 [not applicable], a voluntary trust is created, as to the trustor and beneficiary, by any words or acts of the trustor, indicating with reasonable certainty:

1. An intention on the part of the trustor to create a trust, and,

2. The subject, purpose, and beneficiary of the trust. (Enacted 1872.)

Sec. 2222. Voluntary trust; creation as to trustee.

HOW CREATED AS TO TRUSTEE. Subject to the provisions of Section 852, a voluntary trust is created, as to the trustee, by any words or acts of his indicating, with reasonable certainty:

1. His acceptance of the trust, or his acknowledgment, made upon sufficient consideration, of its existence; and,

2. The subject, purpose, and beneficiary of the trust. (Enacted 1872.)

*fortiori* they constitute income to the trust. The trust concedes that it is an association taxable as a corporation within the purview of section 7701(a)(3). Nevertheless, the trust contends that the distributors' contributions were not income either to it or anyone else. We agree with the trust. In our view, the trust acted as a mere depository of the distributors' contributions and as a conduit for the expenditure thereof in accordance with the distributors' instructions. Consequently, we consider our decisions in *Seven-Up Co.*, 14 T.C. 965 (1950), and its progeny to be controlling of the instant case.

In the *Seven-Up Co.* case, the taxpayer manufactured and sold 7-Up extract to various franchised bottling companies (hereinafter referred to as bottlers). The bottlers bought their own sugar, made their own syrup, and manufactured and sold the bottled beverage known as 7-Up. The taxpayer gave each bottler an exclusive territory, and each bottler carried on his own sales promotion and local advertising within his respective territory. The bottlers initiated discussions among themselves concerning the inauguration of a national advertising program and the establishment of a trust fund since they anticipated having to pay the cost of any such program. An advertising agency familiar with the bottlers' problem presented to the taxpayer, and subsequently to the bottlers, an advertising program, which program was eventually adopted by a majority of the bottlers. The advertising program as adopted called for a "pay as you go" plan wherein each bottler agreed to pay $17.50 per gallon of extract (over and above the prevailing price of the extract) to be billed at the time of purchase.

The 7-Up bottlers had no central organization of their own and the advertising agency therefore recommended that the bottlers make their contributions to the taxpayer company since the agency had no facilities for handling the bottlers' contributions. Before selecting and placing the advertising, the advertising agency discussed its selections and the cost thereof with officers of the taxpayer who served as custodians of the fund. Periodic reports were also made directly to the bottlers by the advertising agency. Although the bottlers' contributions to the national advertising fund were not segregated in a separate bank account, they were segregated and earmarked on its books, and such books remained open for the bottlers' inspection. Due to the fact that the advertising agency was only able to secure a limited amount of desirable advertising space, all of the moneys in the national advertising fund were not expended at the end of the taxable years in issue. The Commissioner included the excess of the bottlers' contributions over the advertising expenditures in the taxpayer's income.

The close parallel between the facts involved in the *Seven-Up Co.* case and the instant case is striking. We are unable to discern any

material differences. In this case, just as there, the distributors were expected to pay their own advertising expenses; a trust was set up to handle the pooled funds of the distributors; the company's facilities and employees were used for convenience in the administration of the fund; the amounts belonging to the trust were meticulously segregated on the books and records at all times; and finally such records were always open for the inspection of the distributors. If anything, the facts herein are stronger since a practicing C.P.A. (although he was the company's C.P.A. and an officer of the company) rather than the company served as trustee and the funds were segregated in separate bank accounts.

In the *Seven-Up Co.* case we expressed our rationale and conclusion as follows:

The respondent has determined that the amounts received by petitioner from the bottlers in each of the taxable years should be included in gross income and the amounts expended for advertising should be taken as deductions. The effect of such a determination is to charge petitioner with a gain or profit to the extent of the excess of receipts over expenditures. But petitioner did not receive the bottlers' contributions as its own property. They were burdened with the obligation to use them for national advertising. No gain or profit was realized on their receipt because of this offsetting obligation. All of the relevant facts and circumstances convince us that the respondent erred in including the payments made by the bottlers in peitioner's gross income for the taxable years, and we so hold. [14 T.C. at 979]

Similar considerations compel us to reach the same conclusion in this case. Pursuant to the instructions of the distributors, all of the money received by the trust for general advertising, freight, postage, and miscellaneous expense were always completely expended by the end of the year of receipt. The only amounts received from the distributors as contributions that were not actually expended by yearend were the amounts set aside in the Dri-Powr Token Redemption Fund account awaiting the return of the issued but still outstanding tokens. It was absolutely essential to the success of the token program that this account at all times contain sufficient funds to redeem dollar-for-dollar the outstanding tokens. The end result of the respondent's determination herein is to charge the trust with a gain or profit to the extent of the amounts residing in the Dri-Powr Token Redemption Fund account at the end of each of the years at issue. But in reality no gain or profit was realized by the trust on these amounts for they were burdened with the obligation of redeeming outstanding tokens of offsetting amounts. Thus, all of the relevant facts and circumstances of this case convince us that the trust was a mere depository of the distributors' contributions and a conduit for the expenditure of such funds. The distributors restricted the purposes for which the trust funds

could be expended to freight, product advertising and promotion, postage, token redemption, and limited miscellaneous expenses. Richkind and Wynn followed the instructions of the distributors, and no trust funds were expended for any other than the authorized trust purposes. It is not the mere possession of receipts that creates income, but rather the unfettered control over their disposition; the trust never had such dominion.

Our decisions in *Broadcast Measurement Bureau, Inc.,* 16 T.C. 988 (1951), and *Angelus Funeral Home,* 47 T.C. 391 (1967), affd. 407 F. 2d 210 (C.A. 9, 1969), also strongly support our conclusion herein. The case of *Krim-Ko Corporation,* 16 T.C. 31 (1951), relied upon by respondent was distinguished in *Broadcast Measurement Bureau, Inc., supra,* at 1002, as follows:

> Our decision in the recent case of *Krim-Ko Corporation,* 16 T.C. 31, is similarly distinguishable on the facts. Taxpayer there was a profit-making concern. It had not undertaken to return the unexpended sums it received from some of its customers for the purpose of furnishing designated advertising materials and services. Its agreements with customers did not place any restriction on the use of any amounts received by it for advertising, nor indicate in any way it was to act as a trustee.

The same characteristics are equally applicable to distinguish that case from the instant one.

Based upon the foregoing, we hold that the distributors' contributions are not taxable to the trust. In view of this holding, we do not find it necessary to pass upon the question of whether a deduction is allowable for the amounts retained in the trust for the anticipated redemption of tokens. Accordingly,

*Decisions will be entered for the petitioners.*