### COMMISSIONER OF INTERNAL REVENUE v. NATIONAL GRANGE MUT. LIABILITY CO.

### No. 3049.

Circuit Court of Appeals, First Circuit.

Nov. 27, 1935.

Berryman Green, Sp. Asst. to Atty. Gen. (Frank J. Wideman, Asst. Atty. Gen., and Sewall Key, Sp. Asst. to Atty. Gen., on the brief), for petitioner.

H. C. Kilpatrick, of Washington, D. C., for respondent.

Before MORTON, Circuit Judge, and MORRIS and McLELLAN, District Judges.

MORTON, Circuit Judge.

The respondent claims to be a mutual casualty company and as such exempt from taxation. The Commissioner held that it was not exempt and assessed against it for the tax year 1931 income taxes in the sum of $3,186. On an appeal by the taxpayer the Board of Tax Appeals overruled the Commissioner and held that the company was exempt. The Commissioner has appealed. The statute involved is the Revenue Act of 1928, the exemption claimed resting on section 103, cl. 11 (26 U.S.C.A. § 103 and note).

There is no controversy about the basic facts. They were stated by the Board as follows:

"The petitioner was incorporated in 1923 under the laws of New Hampshire. Its sole business has been to insure members of the National Grange, a national fraternal organization of farmers, against liability arising from the use of automobiles. The petitioner in 1931 was

authorized to transact its insurance business in ten different states of the United States. Its articles of incorporation were amended several times prior to the year 1931. In May, 1930, these articles were amended to provide in part as follows:

"Article IV.

"The amount of the authorized Guaranty Fund of this Company shall be two hundred fifty thousand ($250,000) dollars to consist of twenty-five hundred (2,500) units of the value of One Hundred ($100.-00) Dollars each. Said Guaranty Fund shall be subject to taxation in accordance with the provisions of the Public Statutes of New Hampshire. The Guaranty Fund shall not be liable to be applied to the payment of losses and expenses until after the Company shall have exhausted its cash and invested assets, exclusive of uncollected premiums, and any such impairment of said Guaranty Fund may be restored in whole or in part in accordance with Article VII of the By-Laws (i. e., by assessment or assessments levied upon the contingent funds of the Company by order of the Board of Directors).

"The units of the Guaranty Fund shall be issued in exchange for the shares of Preferred Guaranty Capital Stock now outstanding, on the basis of one unit of the Guaranty Fund for one share of said Preferred Guaranty Capital Stock or shall be issued from time to time for such price, not less than $100.00 per unit and in such amounts as the Board of Directors shall determine.

"In the event that the company shall have and be in possession of a surplus equal to ten per centum (10%) or more of its gross annual premium income, the holders of the Guaranty Fund units shall be paid interest at the rate of seven per centum (7%) per annum and no more, subject, however, to the regulations and the laws of the authorities of the various states in which the Company is licensed to do business. Such interest shall be cumulative so that if in any year or years interest upon the outstanding Guaranty Fund units at the rate of seven per centum (7%) per annum shall not have been paid, the deficiency shall be paid before any dividends may be declared and paid to the policyholders. Such interest, if paid, shall be payable semi-annually on such days as the Directors shall determine. The holders of the Guaranty Fund units shall not be entitled to vote at any of the meetings of the Company.

"Whenever all interest on the Guaranty Fund units for all previous years shall have been declared and paid, and a sum sufficient for such interest as may have been accrued shall have been set aside for the payment thereof, dividends to the policyholders may be declared and paid out of the remaining surplus and net profits of the Company.

"The Guaranty Fund units as an entirety or any part thereof shall be subject to redemption and in the event that the Company shall have and be in possession of a surplus equal to ten per centum (10%) or more of its gross annual premium income, such units may be redeemed by a majority vote of the Directors by payment or tender for each unit so to be redeemed of One Hundred Ten Dollars ($110.00) per unit and all accrued and unpaid interest up to and including the year 1932, and at any time thereafter of One Hundred Five Dollars ($105.00) per unit and all accrued and unpaid interest, and in the event that the Company shall not have and be in possession of a surplus equal to ten per centum (10%) or more of its gross annual premium income, such units may be redeemed in the manner and upon the terms above provided, subject, however, to the permission of the New Hampshire Commissioner of Insurance first obtained, and subject, further, to the regulations and laws of the authorities of the states in which the Company is licensed to do business.

"In the event of any liquidation or dissolution, whether voluntary or involuntary, of the company, the holders of the Guaranty Fund units shall be entitled to be paid in full both the amount of their units and any unpaid interest thereon before any payment shall be made to policyholders of the Company, but the holders of the Guaranty Fund units shall not be entitled to share further in the assets of the Company or in the proceeds of liquidation. After the payment in full to the holders of the Guaranty Fund units of the amount of their units and the unpaid interest accrued thereon, if any, and the payment to the policyholders of any dividends declared, the remaining assets of the Company shall be distributed

pro rata to the policyholders of the Company.

"The by-laws of the corporation were changed at the same time to provide, inter alia, that the policyholders would be the only members of the company and the only persons entitled to voting power; the holders of guaranty fund units would have no voting power; the directors would have the right to assess each policyholder such amount, not exceeding twice the total cash premium on his policy, as they might deem necessary to pay losses and expenses and to declare dividends to policyholders; and all interest of a member in the profits and surplus of the company ceases when he ceases to be a policyholder. Immediately after these changes were made $200,000 par value of guaranty fund units were issued, mostly in exchange for preferred guaranty capital stock theretofore outstanding. Seven percent on $200,000 par value of guaranty fund units was accrued monthly from June 1, 1930, and was paid semiannually on December 1, 1930, June 1, 1931, and December 1, 1931. Certificates for guaranty fund-units were issued. Each stated that it was for fully paid and nonassessable units and was transferable only on the books of the corporation upon surrender properly endorsed.

"The surplus of the company was as follows:

"December 31, 1929, $32,079.58.

"December 31, 1930, $36,209.34.

"December 31, 1931, $71,112.86.

"The gross annual premium income of the company was $154,363.36 for 1930 and $191,370.46 for 1931.

"The petitioner during the year 1931 was a mutual casualty insurance company, the income of which was used or held for the purpose of paying losses or expenses."

The exempting section reads as follows:

"Sec. 103. Exemptions from tax on corporations.

"The following organizations shall be exempt from taxation under this title— * * *

"(11) Farmers' or other mutual hail, cyclone, casualty, or fire-insurance companies or associations (including interinsurers and reciprocal underwriters) the income of which is used or held for the purpose of paying losses or expenses." (26 U.S.C.A. § 103 and note.)

The Commissioner contends that the respondent was not exempt under this section because (1) it did not come within the general class of corporations therein referred to; and (2) if it were within that class, its financial set-up was such as to deprive it of the exemption.

■ The first question is one of statutory construction, depending on whether the exemption in question was restricted to companies of local character or also included those which like the petitioner did a more extensive business. This point is fully and clearly discussed in the opinion of the Board of Tax Appeals. We agree with the views and conclusion of the Board on it, and it is not necessary to restate them.

■ The other point is more troublesome. The respondent was organized primarily for the purpose of insuring members of the National Grange, an organization of farmers, against liability for automobile accidents. It is and was a mutual company. The general characteristics of such companies are well understood. See Duffy v. Mutual Benefit Life Ins. Co., 272 U.S. 613, 47 S.Ct. 205, 71 L.Ed. 439; Penn Mutual Life Ins. Co. v. Lederer, 252 U.S. 523, 40 S.Ct. 14, 63 L.Ed. 1192; Atlantic Life Ins. Co. v. Moncure (D.C.) 35 F.(2d) 360. The members of the corporation are the policyholders. They are assessed premiums from which expenses and losses are paid. It is desirable, and for certain purposes necessary, that such companies should have a fund called a "guaranty" or "reserve" fund which can be drawn on to pay extraordinary losses. When such companies are organized, it is expected that such a fund will be gradually created out of unused premiums. This, however, takes time; and the fund must be in hand when the company begins business. This necessity was evidently recognized by the organizers of the respondent, and at its organization a guaranty fund was provided by the issue of preferred stock on which dividends if earned were to be paid.

It was later held that this arrangement made the company a stock company and taxable accordingly. In order to avoid such taxation the company was reorganized in 1930, the preferred stock being abolished and retired and in its

place a guaranty fund being created by the sale of guaranty fund certificates. It is said that most or all of the preferred stockholders exchanged their stock for guaranty fund certificates. As the guaranty fund was provided for the payment of losses, it was essential that the company's liability for it should be postponed to its liabilities under its policies. It was also desirable, and for certain purposes essential, that the company be under no direct obligation with respect to repayment of the guaranty fund and therefore not obliged to carry it as a liability on its books and statements.

To achieve these objects, article IV of the articles of incorporation was adopted, which is quoted in the findings of fact; it establishes the guaranty fund and the rights which attach to units in it. By reference to it, it appears that the fund was not to be resorted to until the company's cash and securities, not including uncollected premiums, had been exhausted; that any impairment of it might be restored by assessments on policyholders; that when the company's surplus amounted to 10 per cent. or more of its gross annual premiums the holders of the guaranty fund units should be paid interest at the rate 7 per cent.; that such interest should be cumulative and any deficiency therein should be made good before any dividends were paid to policyholders; that interest if paid should be payable semiannually on such dates as the directors should determine; that the holders of the units should not be entitled to vote at any meetings of the company; that on liquidation or dissolution of the company the holders of the units were entitled to be paid in full both the face value of the units and any unpaid interest thereon before any payments should be made to the policyholders. Provisions were made governing the redemption of the units, the payment of dividends to policyholders, etc.

The Commissioner held that these guaranty fund units were substantially the same thing as the preferred stock which they replaced and were in effect preferred stock; that the company was therefore not exempt as a mutual company, but was taxable as a stock company.

The character of the units is to be determined by the provisions of article IV under which they were issued. New York, L. E. & W. R. Co. v. Nickals, 119 U.S. 296, at page 307, 7 S.Ct. 209, 30 L.Ed. 363. There are a number of differences between them and the preferred stock which they superseded: (1) Payments on them are described as "interest"; (2) it must be paid if the required surplus exists, no declaration like that of a dividend or other action of the corporation being necessary; (3) holders of the preferred stock had certain limited rights of voting, whereas no such rights apply to the guaranty fund units; (4) there are differences in the provisions for the redemption of the stock and of the units. The points especially relied upon by the Commissioner as assimilating the guaranty fund units to the preferred stock are that they carried no direct obligation for payment of principal or interest; that the holders had no right to enforce payment of them and only a restricted right to restoration of the fund if it became impaired by losses; that the rights on liquidation are substantially the same, the differences not being practically important; that in effect the owners of the guaranty fund put their investment into the company at the risk of its business. This he insists amounts to a description of preferred stock, and the guaranty fund units do not lose their true character as stock by reason of the fact that payments on them are called "interest" instead of "dividends," and the other differences referred to.

No decision stating tests by which preferred stock is to be distinguished from indebtedness has come to our attention. A somewhat analogous question occasionally arises in partnership cases where the claim is made that a person who advanced money to a firm on the understanding that he should have an interest in the profits thereby became, as a matter of law, a partner. In such cases it is settled that an intention of the parties that there should be no partnership will be accepted unless the circumstances are so strong as to compel a finding that there was a partnership as a matter of law. "The true rule, ex æquo et bono, would seem to be that the agreement and intention of the parties themselves should govern all the cases. If they intended a partnership in the capital stock, or in the profits, or in both, then that the same rule should apply in favor of third persons, even if the agreement were unknown to them. And on the oth-

er hand, if no such partnership were intended between the parties, then that there should be none as to third persons, unless where the parties had held themselves out as partners to the public, or their conduct operated as a fraud or deceit upon third persons." Story on Partnership (§§ 1, 38, 49), quoted in Meehan v. Valentine, 145 U.S. 611, at page 621, 12 S.Ct. 972, 974, 36 L.Ed. 835. It is a sound general rule that in dealing with business matters courts ought to give effect to the intention of the parties unless clearly precluded from doing so by a rule of law. That the rights of third parties may be affected was not regarded as a sufficient objection to the rule in partnership cases where the rights of creditors were involved; and the objection does not seem more weighty where the rights of the government are involved.

The differences between the guaranty units and the old preferred stock are more than merely verbal. The entire absence of voting rights under any circumstances or conditions, while not unknown, is very unusual in preferred stocks. Moreover, preferred stock is usually strengthened and supported by assets contributed by the holders of junior securities. Here there was nothing of that sort. It was not even the purpose of the company to make profits; the idea was to furnish insurance at cost. As to interest on the units the provisions respecting it are as definite as those sometimes found in so-called "income" bonds. Everything considered; it would seem that the differences between the units and preferred stock are as great as those between the units and ordinary loans. The intention of the persons interested in the respondent company clearly was to substitute for the guaranty fund provided by the preferred stock one made up of borrowed money; of this there seems to be no room for doubt. The requirements of the situation compelled them to put the company's obligation to the lenders into a tenuous and unusual form. But the essential character of the obligation, i. e., to repay borrowed money, was not changed. Payments for the use of this money were therefore interest and properly deductible as expenses of doing the business. On this point also we agree with the decision of the Board of Tax Appeals.

The decision of the Board of Tax Appeals is affirmed.