BOSTON CONSOLIDATED GAS COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 102050. Promulgated June 24, 1941.

*John E. McClure, Esq.*, for the petitioner.
*W. Herdman Schwatka, Esq.*, and *Edward L. Updike, Esq.*, for the respondent.

BLACK: The respondent determined a deficiency in income tax against petitioner for the taxable year ended December 31, 1935, in the amount of $32,242.13. The petitioner brings this proceeding for a redetermination of his tax liability for that year. The respondent admitted at the hearing that petitioner was entitled to an additional deduction of $517.42 representing electrical energy tax which accrued in 1935. Certain other adjustments made by the Commissioner in his determination of the deficiency are not contested.

In its petition the petitioner alleges that the taxes in controversy are in the amount of $29,886.78, based on the following errors:

(1) In adding to income unclaimed amount of deposits made in the distant past by inactive customers, credited to surplus in 1935____ $102,871.16

(2) In adding to income unclaimed amount of cash deposited in meters in the distant past by inactive customers who purchased gas through the quarter meter device_____ 53,453.55

(3) In disallowing as a deduction cash shortage arising from alleged embezzlements in years prior to 1935_____ 61,033.70

The facts were all stipulated and we adopt the facts as stipulated as our findings of fact. We state herein only such of the facts as we deem necessary for an understanding of the issues to be decided.

Petitioner is a corporation organized and existing under the laws of the Commonwealth of Massachusetts, with its principal office in Boston. It filed its income tax returns for the year 1935 with the collector of internal revenue for the district of Massachusetts.

### Facts with Respect to the First Issue.

The petitioner was incorporated in 1903 in Massachusetts for the purpose of acquiring the assets and assuming certain liabilities of eight preexisting gas companies. Its business was and is that of manufacturing, producing and selling gas for light, heat, and power, supplying Boston and suburban territories.

To insure payment of gas bills, certain customers were required to make cash deposits when meters were first installed. These deposits, by the terms of the deposit agreement, were returnable to such customers at the termination of the contracts to supply them with gas.

From prior to 1905 to the taxable year in question, numerous amounts of such deposits had been accumulated either by petitioner's predecessors or by petitioner itself, all of which were accounted for in a general ledger account which totaled $431,014.44 at December 31, 1935. Up to that date the general ledger account was not supported by a detailed customers' ledger account. On December 31,

1935, petitioner set up a detailed customers' ledger which showed a balance of $328,143.28. The general ledger account of $431,014.44 was brought into balance by crediting the difference of $102,871.16 to petitioner's profit and loss (surplus) account.

Subsequent to December 31, 1935, and up to December 31, 1939, petitioner returned to former customers upon demand or credited to the detailed customers' ledger established in 1935 an aggregate net amount of $3,108.93 on account of payments of the kind mentioned above and charged the same to profit and loss (surplus). No part of this amount was included in the aggregate balance of $328,-143.28 shown by the detailed customers' ledger on December 31, 1935. The cash payments received from customers as deposits in the manner above stated were mingled by petitioner with its other cash funds.

### Facts with Respect to the Second Issue.

Another method of collecting gas revenue was through the use of quarter meters, whereby a customer deposited a 25-cent piece in a meter, which then automatically delivered a measured quantity of gas. These meters were furnished to those customers who preferred purchasing gas in small quantities. Notwithstanding the difference in the methods employed in selling gas, the same rates were charged to all customers.

The quarter meters were read monthly and the petitioner's books of account were adjusted accordingly. Often the customer had moved away and the petitioner, failing to locate the customer, carried the unused amount on its books as a liability.

Similar to issue No. 1, the general ledger account, amounting to $163,089.60 on December 31, 1935, was not supported by a detailed customers' ledger account. On that date, the petitioner set up a detailed customers' account of $109,636.05, and brought the general ledger control account into balance therewith by crediting the difference of $53,453.55 to profit and loss (surplus). The respondent has added the $53,453.55 in question to income.

### Facts with Respect to the Third Issue.

During 1935 the petitioner discovered a loss of $99,139.09 in its cash account which occurred through embezzlement by its treasurer. The loss through embezzlement in the cash account of $99,139.09 was discovered through an audit of the petitioner's books by certified public accountants. The audit disclosed that on December 31, 1934, the loss through embezzlement was $98,323.35 and that on January 31, 1935, the embezzlement loss was $99,139.09. In the annual audit of petitioner's books of account by certified public accountants made

early in 1934, covering the calendar year 1933, no such cash shortage was discovered.

The taxpayer recovered a part of the shortage as follows: from a bonding company, $25,000; from the treasurer's beneficiaries, $10,000; and cash found in the safe, $2,599.15; making a total of $37,599.15. The balance, $61,539.94, was charged off on the books in 1935 and claimed as a deduction by the petitioner on its 1935 tax return. The respondent allowed as a deduction only $506.24, on the ground that this amount was embezzled in 1935. He arrived at this $506.24 in the following manner, as stated in his deficiency notice:

The audit also disclosed that on December 31, 1934 the cash shortage was $98,323.55 and on January 31, 1935 the cash shortage was $99,139.09, indicated that only $815.54 of the shortage in question occurred in 1935.

In accordance with the method of allocating recoveries on the basis of the amounts recovered and the years in which the shortage occurred as employed in the case of *Granada Bank*, 32 B. T. A. 1290, it has been determined that the amount of allowable deduction in 1935 is $506.24, and that the balance of the shortage (i. e. $61,033.70) is not applicable to 1935. The following illustrates the allocation of the loss:

| | Total Loss All Years | Amount Recovered | Allocation of Loss |
|---|---|---|---|
| Shortage prior to 1935 | $98,323.55 | $37,289.85 | $61,033.70 |
| 1935 Shortage | 815.54 | 309.30 | 506.24 |
| | $99,139.09 | $37,599.15 | $61,539.94 |

The petitioner claims that the $61,033.70 disallowed by the Commissioner constituted a loss in 1935 and should be allowed as such.

*Issues (1) and (2).*—These issues involve substantially the same question and may be considered together. Both the petitioner and the Commissioner, in their briefs, treat the basic question involved in issues (1) and (2) as the same.

It is the respondent's contention that the amounts involved in these issues are includible in income for the year 1935 as a result of the credit of such amounts to petitioner's surplus in that year, making them available for dividends and other corporate purposes and thus realizing within that year an accession to income within the intendment of section 22 (a) of the Revenue Act of 1934.

The petitioner contends that the crediting of the amounts in question to surplus was for the purpose of facilitating the keeping of its accounts and not for the purpose of appropriating the sums as its own property, and that it was still liable to repay any claims of former customers for refunds of deposits or overpayments of their gas accounts if established to be payable from these funds.

In *Chicago, Rock Island & Pacific Railway Co.*, 13 B. T. A. 988; affimed on this point, 47 Fed. (2d) 990, overcharges by the railroad

resulting from errors in computing passenger fares and credited to profit and loss were held, as a practical matter, to be a part of the income of the railroad company for the year during which they were credited to income. In its opinion the court, among other things, said:

In case petitioner were required to refund any of such overcharges to a passenger, who identified the transaction, we have no doubt that such refund would be a proper deduction for the year in which it was made.

In *Charleston & W. C. Ry. Co.* v. *Burnet*, 50 Fed. (2d) 342, affirming 17 B. T. A. 569, unclaimed wages earned by employees prior to January 1, 1922, were credited to profit and loss in December 1924. In holding that the amounts thus restored to profit and loss were income for the year in which the restoration was made, the court said that, though the company intended paying proper claims on the fund if and when sought:

* * * the effect of the bookkeeping was to make available for general uses the particular moneys impressed in 1921 with the particular obligation * * *.

It thus became as much a part of the gross revenue in 1924 as though paid in that year for carriage charges.

To the same effect is *Atlantic Coast Line Railroad Co.*, 23 B. T. A. 888.

We think the principle governing the decisions in the above cases is applicable here. It is true that subsequent to 1935 petitioner paid out the sum of $3,108.93 against the amount of $102,871.16 and there is a possibility more claims may be presented and paid. If so, such payments should be deducted from income in the year in which paid. Obviously they do not affect the status of the $102,871.16 and $53,-453.55 which petitioner transferred to profit and loss (surplus) in 1935 and made available for general uses including the payment of dividends.

On issues (1) and (2) we sustain the respondent.

*Issue (3).*—An audit of petitioner's books in 1935 disclosed that on December 31, 1934, funds in the amount of $98,323.55 had been embezzled in that and prior years and that on January 31, 1935, the amount of the loss had increased to $99,139.09. This indicated that only $815.54 of the total amount was embezzled in 1935. Of the total amount embezzled, petitioner recouped $37,599.15 from a bonding company and other sources. The respondent allocated the amount recovered as between the amount embezzled prior to 1935 and the amount embezzled in 1935, and allowed as a loss in 1935, not compensated for by insurance or otherwise, and deductible in that year, the amount of $506.25. The petitioner contends that the entire amount of $99,139.09 is deductible in 1935, the year in which it was discovered.

The statute (sec. 23 (f), Revenue Act of 1934) provides that in computing net income there shall be allowed as deductions; "In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise."

It is well settled that embezzlement does not raise a debtor-creditor relation between the parties, but results in a loss in the year the embezzlement occurs. *National Sash & Door Co.*, 5 B. T. A. 931; *Peterson Linotyping Co.*, 10 B. T. A. 542; *Bank of London & South America, Ltd.*, 17 B. T. A. 1263; *Bank of Wyoming*, 22 B. T. A. 1132; *Piggly Wiggly Corporation*, 28 B. T. A. 412; *First National Bank of Sharon, Pa.* v. *Heiner*, 66 Fed. (2d) 925; *Grenada Bank*, 32 B. T. A. 1290.

In *First National Bank of Sharon, Pa.* v. *Heiner, supra,* an employee of a bank embezzled funds during the years 1922 to 1928, inclusive. The Circuit Court of Appeals for the Third Circuit held that the funds embezzled constituted a loss and not a bad debt and could only be deducted in the year in which it occurred.

We hold, therefore, that the respondent properly limited the loss deductible to the loss sustained in 1935 and that his allocation of the amounts recovered between the loss sustained in 1935 and the loss sustained in prior years was proper. *Grenada Bank, supra.*

*Decision will be entered under Rule 50.*