GROWERS CREDIT CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 60562. Filed February 29, 1960.

*F. A. LeSourd, Esq.*, and *Griffith Way, Esq.*, for the petitioner.
*Wilford H. Payne, Esq.*, for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in petitioner's income taxes and a 5 per cent negligence addition to tax under section 293(a), I.R.C. 1939, as follows:

| Fiscal year ended May 31— | Deficiency | Addition to tax, sec. 293(a) | Fiscal year ended May 31— | Deficiency | Addition to tax, sec. 293(a) |
|---|---|---|---|---|---|
| 1948 | $52,914.93 | | 1950 | $38,507.96 | |
| 1949 | 30,746.29 | | 1951 | 44,702.07 | $2,235.10 |

The issues for decision are whether petitioner is exempt from tax under section 101(13), I.R.C. 1939, and if not, whether deposits of 5 cents per box of fruit sold by its borrower-stockholders required under terms of the loan agreement to indemnify petitioner against credit and operating losses are taxable income to petitioner in the year of receipt. It becomes unnecessary for us to pass on other issues raised in the pleadings because of agreements between the parties and as a result of our conclusions on the above two issues. Respondent waived the addition to tax on brief.

### FINDINGS OF FACT.

The stipulation of facts filed by the parties is incorporated herein by this reference.

Petitioner, a corporation with its principal offices in Wenatchee, Washington, filed its income tax returns for the fiscal years 1948 through 1951 with the district director of internal revenue at Tacoma, Washington.

Wenatchee is the center of a large fruitgrowing area known as the North-Central Washington fruit area consisting of Wenatchee and Okanogan valleys.

The production of fruit involves the use of substantial funds every year for spraying, fertilizing, boxing, labor, and other necessary expenses for the growing, packing, and marketing of the crop.

During the past 30 years the growers in the North-Central Washington fruit area have had difficulty in securing the necessary funds from private sources. It was particularly difficult for fruitgrowers to finance their production and marketing operations during the depression years of 1930 to 1940. As a result, in 1940 the North-Central Washington area was declared a distress area by the Federal Government. The same year the Department of Agriculture sent a representative to investigate the credit situation. The Farm Credit Administration held meetings with farmers and growers in the area in order to develop possible solutions for the credit problem. A group representing land users in the area, known as the Land Use Planning Committee, hereafter referred to as LUPC, took a prominent part in the discussions that followed. The LUPC was a voluntary movement. It had no funds, offices, nor place of business. Any fruitgrower was eligible to belong. It served in an advisory capacity.

The organization of the LUPC among the growers was encouraged by the Department of Agriculture. Each community had its own committee and every grower in the community had the right to vote for members of this committee. These community committees in turn elected representatives to a county LUPC. The county committee elected representatives to the district LUPC covering the North-Central Washington fruit area. Representatives of a number of agencies in the Department of Agriculture sat with these committees.

A program was developed by the district LUPC for meeting the various problems of the fruitgrowers, of which financing and supply were the principal ones. The district LUPC recommended the organization of a grower-owned finance corporation and the use of a local supply cooperative. These recommendations were approved by the Secretary of Agriculture. The financing plan included immediate financing by the Regional Agriculture Credit Corporation, hereafter referred to as RACC, a Federal agency. It was announced that the RACC would make loans to growers for a period of approximately 5 years during which time there would be organized a grower-owned and -controlled credit corporation which would thereafter provide for the credit needs of fruitgrowers.

The RACC began making loans to the fruitgrowers in the area in 1941. As a condition of the loans, approval of each grower by the LUPC was required. It was also suggested that the money advanced for supplies be spent through a warehouse that was cooperating with the LUPC.

RACC required that the borrowers deposit 2 cents per box of fruit into a reserve fund, and RACC deducted 2 cents per box from

the fruit checks which the growers received upon the sale of their fruit and which were made payable jointly to the growers and to RACC by the warehouse selling the fruit. The amounts deducted were credited to the growers on the books of RACC. These funds were remitted by the RACC to the United States Treasury where they were invested in Government bonds. RACC had the right to charge against this reserve fund any losses incurred by it in making loans in the North-Central Washington fruit area. The growers were told by the official LUPC members that the purpose of this fund was "to set aside two cents per box to build up individual grower reserves."

When RACC ceased its lending operations in 1945, all of the deposits in the reserve fund were returned to the grower-depositors. No losses were charged against the reserve fund since the few credit losses that had occurred were met by another source of funds.

The LUPC had a supply program as well as a financing program. It recommended the use of a wholesale purchasing cooperative to supply the local cooperative units. Northwest Wholesale, Inc., hereafter referred to as Northwest, a corporation which had been organized in 1937, was selected by RACC, upon the recommendation of LUPC, as the principal purchasing agent for supplies and materials.

Only organized cooperatives could deal directly with Northwest and become members of that organization. Individuals could not buy directly from or become members of Northwest, but bought their supplies through the organized cooperatives. Northwest enlarged its accounts and increased its membership in 1941 and 1942. A letter was issued ruling that it was an exempt cooperative under the income tax laws beginning with its fiscal year 1947.

After RACC started lending in 1941, steps were taken by the district LUPC and RACC to organize a grower-owned credit corporation. The growers were polled as to what type of organization they desired and they voted for an organization like RACC. Articles of incorporation, bylaws, and rules and regulations were drawn up under the guidance of the district LUPC, and the articles of incorporation of petitioner were filed with the secretary of state for the State of Washington on December 7, 1944.

The incorporators of petitioner were five fruitgrowers of the North-Central Washington area. Four of the five were voting members of cooperatives which were in turn members of Northwest, and the fifth was a voting member of an exempt farm cooperative which, while not then a member of Northwest, did later become a member of Northwest.

Petitioner was organized under the Uniform Business Corporation Act of the State of Washington for a term of 50 years. The

objectives and purposes for which the corporation was formed are stated in article 3 of its articles of incorporation as follows:

SECTION 1. To advance and lend money to and/or furnish credit facilities for persons, firms or corporations engaged in the production and/or marketing of horticultural and agricultural products including livestock, and associations of persons, firms or corporations so engaged; to borrow money and issue bonds, notes or other obligations therefor and to secure the same by pledge, mortgage or trust deed on the whole or any part of the property of this corporation, or otherwise; to buy, sell, discount or otherwise deal in notes and other evidences of debt; to endorse and/or give any guaranty for the payment of any such notes or other obligations issued or acquired in conducting its business; to pledge its assets, for accommodation or otherwise, in furtherance of its business; and to have and exercise such other powers as may be necessary and incident to the specific powers hereinbefore expressed; and in addition thereto to have all the general powers granted to corporations by virtue of laws of the State of Washington.

SECTION 2. To buy or otherwise to acquire and to own and operate, mortgage, lease, sell or otherwise dispose of any and all kinds of property, real, personal or mixed, or any interest therein, to any extent, and to contract for the purchase, sale, disposal, lease or rental of any such property, for the purpose of furthering any of the business of this corporation. To hold, purchase or otherwise acquire, or to be interested in, and to sell, assign, pledge or otherwise dispose of, shares of the capital stock, bonds or other evidences of debt issued or created by this or any other corporation, whether foreign or domestic and whether now or hereafter organized; and while the holder of any such shares of stock to exercise all the rights and privileges of ownership, including the right to vote thereon, to the same extent as a natural person might do or could do.

Petitioner's articles of incorporation authorized preferred and common stock. Some preferred stock was issued but has since been redeemed. It was nonvoting. Each owner of common stock had only one vote no matter how many shares of stock he held.

The common stock could be held only by producers of horticultural or agricultural products and associations of such producers who had patronized the corporation within a period of 1 year or who were about to become patrons of petitioner. When a stockholder ceased to be eligible to hold the stock, he no longer had any rights or privileges on account of the stock or vote or voice in the management of the affairs of petitioner. Petitioner had the right to require the transfer of any such stock at the book value or par value, whichever was less.

The articles of incorporation authorized noncumulative dividends not to exceed 6 per cent per year on the common stock when funds were available and when declared by the board of directors. No common stock dividends have ever been declared or paid. The business and property of petitioner were under the management and direction of its board of directors consisting of seven members.

Petitioner's only business has been the securing of funds from commercial bankers and the loaning of these funds to its grower-stockholders. It has at no time been in the business of buying supplies or marketing products of its stockholders or others.

In order to borrow from petitioner the grower must hold a specified amount of stock in petitioner, originally 25 cents per packed box of his annual production. All loans made by petitioner to its borrowers were for the purposes of financing ordinary crop operations, such as harvesting, packing, storing, and marketing of fruit, including necessary care and preservation of orchards.

All notes given by borrowers were required to be secured by crop liens or mortgages, together with such other liens on machinery, equipment, real estate, or other property as might be required as security, conveying a fixed and paramount lien to petitioner.

Each borrower was required to agree that all net proceeds from the sale of pledged fruit would be remitted to petitioner by the marketing agency. Checks by purchasers were made jointly to the borrower, petitioner corporation, and the bank furnishing petitioner with funds. Interest was charged on all loans. In addition, charges were made for title examination and recording, and the supervisory services furnished by petitioner.

Each applicant for a loan was required to agree to participate in the creation of a "reserve fund" to be established, held, and administered by petitioner. The rules and regulations of petitioner required and the loan applications made by the borrowers provided that the fund should be established and administered, as follows:

(a) There shall be deducted from the net sales proceeds of all pledged or mortgaged fruit the sum of five cents (5¢) per packed box or its equivalent of packed fruit sold and five cents (5¢) per field box or its equivalent of all fruit otherwise sold. Such deduction shall be made by the lender and/or pledgee from remittances received by either.

(b) The funds so created shall be deposited in a separate account and may be pledged by the credit corporation to secure bank loans. The funds shall be held for the following purposes:

To indemnify the credit corporation for any operating or credit losses sustained by the corporation in the making of loans to fruit growers in the Wenatchee-Okanogan area, the credit corporation being authorized to charge against such fund any and all losses as determined by it. In the event the credit corporation pledges the fund to a bank, the fund shall be held by the bank as security for any and all indebtedness at any time owing by the credit corporation to the bank.

Whenever in the discretion of the Board of Directors the reserve fund is found to be in excess of the amount deemed necessary for the sound financial operation of the corporation such excess funds shall be paid to the persons entitled to receive the oldest unexhausted balances of the "Reserve Fund" pro rata by years.

After all loans made by the credit corporation have been liquidated and all losses chargeable to the reserve fund have been determined and deducted

therefrom, the balance remaining in the fund shall be returned to the contributors of such fund to the extent of their participation therein.

The funds loaned by petitioner to its borrowers were borrowed from the Seattle-First National Bank and participating banks. A line of credit of approximately $4 million was established. The use of all funds loaned by the banks was limited to the financing of the fruit crops of petitioner's stockholders.

The money received by petitioner for issuance of its capital stock was invested in United States Government bonds, as was the money paid into the reserve fund by growers. Throughout the years 1947 through 1951, petitioner owned approximately $1 million in 2½ per cent Government bonds held on deposit with the Seattle-First National Bank as collateral for loans. Petitioner also pledged the notes, chattel mortgages, and other security which it received from its borrowers as collateral with the bank.

The loan agreements entered into by petitioner and the Seattle-First National Bank provided that the 5-cent-per-box deposits of each grower-stockholder of petitioner would be made by means of the bank deducting that amount from the borrower's remittance of the net sales proceeds of all pledged fruit. These agreements also contained an authorization for the return to the reserve fund depositors of particular amounts agreed on between the bank and petitioner for return in that particular year.

Petitioner was able to borrow from the bank during the years involved at 3¾ to 4 per cent interest. Petitioner charged its borrowers a higher rate of interest, usually 6 per cent during this period. Petitioner also charged an inspection fee to cover the service of its horticulturists, the fee being 1 per cent of the amount borrowed irrespective of the length of time of the borrowing. Petitioner also received the interest from and premiums on sale of the Government bonds, both those representing the capital stock account and those representing the reserve account. Petitioner received no other income, except for small items of bookkeeping profit on sale of used equipment. Operating expenses were paid out of the above income.

Petitioner maintained five accounts with the Seattle-First National Bank:

(a) "Bank Control-Collateral Account," a 1-day clearing account in which are deposited checks of growers forwarded to the bank by petitioner.

(b) General Account.

(c) Expense Account.

(d) Bank Control-Reserve Trust Account.

(e) Suspense Trust Account.

From the beginning of petitioner's operations to the present, petitioner has maintained with the bank the "Bank Control-Reserve

Trust Account" under that name, and has deposited in it all deposits made by its borrowers to the reserve fund. The bank and petitioner understood the title of this account to mean that the funds were held in trust for the borrowers, but the account was subject to bank control because it was pledged to the bank as security for the bank's loans to petitioner.

A suspense item, as set up on the cash receipts journal sheet and deposited in the suspense trust account, was the excess of a remittance from a borrower after full payment of his loan and interest and inspection fees, and after the deposit had been made in his reserve account. The suspense items deposited in the suspense trust account were held for remittance to the borrower on demand.

Upon receiving a daily receipts journal sheet from petitioner, the bank distributed on its books the deposits covered by that sheet, crediting petitioner's bank control-reserve trust account with the amount of deposits to that account listed on the sheet, crediting petitioner's expense account with the amount of the interest and inspection fees listed on the sheet, crediting the amounts applicable to principal of the loans, as listed on the sheet, to the various individual growers' notes, as well as to petitioner's note to the bank, and crediting petitioner's suspense trust account with the amount of the deposit shown for that account on the cash receipts journal sheet. At the same time, petitioner likewise distributed the funds to these various accounts on its books.

After the checks cleared the bank, petitioner distributed the amounts thereof to the accounts of the various individual borrowers on its books. At this time, the deposit to the reserve account of each borrower was credited to him on his individual loan ledger sheet maintained by petitioner. At the same time that this credit was made, petitioner sent to each borrower a receipt, showing the total amount of the check received and showing the allocation of the check to each item of principal, interest, inspection fee, reimbursable expense, reserve fund, and suspense account. Receipts of this character were sent out to all borrowers at all times during the existence of petitioner, representing each payment made.

In 1951, petitioner decided that a supplementary ledger was needed which would show each year's reserve fund deposits of each borrower, without having to go back through the loan ledger sheets of the borrower to find it. Additional ledger cards were made out for each borrower at this time, showing separately, by years, the deposits in the reserve fund as taken from the loan ledger sheets. Refunds of the reserve fund to the borrower were likewise recorded on these ledger cards at the time refunds were made to the borrower. In 1953, this reserve fund ledger card was further refined by using a

form with separate column for each year, so that a running balance of the borrower's deposits for each year after crediting refunds could be kept.

The amounts of the reserve fund deposits, representing the 5 cents per box received and held by petitioner from the proceeds of sales of fruit of its borrowers for the respective fiscal years ended May 31, were as follows:

| Year | Amount |
|------|--------|
| 1948 | $126,407.58 |
| 1949 | 86,544.89 |
| 1950 | 103,560.93 |
| 1951 | 102,187.40 |

The balances in the reserve fund held by petitioner at the end of each of those years were as follows:

| Year | Amount |
|------|--------|
| 1948 | $229,532.88 |
| 1949 | 312,992.01 |
| 1950 | 415,182.61 |
| 1951 | 482,449.44 |

The only credit losses charged by petitioner to the reserve fund from 1948 through 1951 amounted to $20,194.52. If an individual borrower could not pay his loan, he was required to assign all of his interest in the reserve fund to petitioner, and this interest was first applied against his account before any amount was charged against the fund.

No operating losses have been charged to the reserve fund. Although the orchard loan application signed by each borrower provided that the reserve fund should be held to indemnify petitioner for operating as well as credit losses sustained by petitioner, the directors of petitioner construed this provision as meaning that there was no operating loss as long as there was the possibility that deficits could be offset by subsequent operating surpluses.

No amounts were returned to borrowers by petitioner from the reserve fund during its fiscal years 1948, 1949, and 1950 with the exception of the reserve fund balances of certain growers which were applied in satisfaction of their loans. In March 1951, petitioner returned one-third of all deposits in the 1946 reserve fund, amounting to $33,858.47. Thereafter, petitioner adopted a policy of returning to current borrowers any amounts in the borrower's reserve fund which exceeded 110 per cent of the amount of stock the borrower was required to hold.

When members of petitioner have died, the reserve funds standing to their accounts have been treated in probate as assets of their estates and their interest in the fund has been transferred on petitioner's books to the heirs and paid out to them.

There is no relationship between the amount any borrower may deposit in the reserve fund in a given year and the amount of stock which that borrower may own. Refunds were based on the borrowers' pro rata interest in the reserve fund for the specific year. Accordingly, the refund going to borrowers was not based upon the amount of stock owned compared to total stock outstanding.

Throughout the fruitgrowing area of North-Central Washington, each community has one or more local cooperatives, largely built around local warehouses. Petitioner has, over the years, advised with these local cooperatives on such matters as materials, spray programs, and harvesting of the fruit. Petitioner's horticulturists also conferred with the local cooperatives in determining whether particular growers should receive loans from petitioner. Five out of the seven directors of petitioner were also directors of local cooperatives all of which were members of Northwest.

Petitioner determined the amount of its loans to its borrowers on the basis of a budget drawn up by the borrower to accompany his loan application which was based on prices furnished by Northwest. Petitioner issued bulletins to its borrowers with spray recommendations, listing the prices at Northwest for these sprays, and also listing other items available at Northwest. The manager of petitioner and its staff and the manager of Northwest have consulted frequently over the years on such matters as fruit samples, frost alarms, production problems, marketing problems, fruit problems, and financing problems of the growers.

The total number of qualified voting stockholders of petitioner and the total amount of petitioner's common stock held by them for the crop years 1948 through 1951 were as follows:

| Year | Stockholders | Stock held | Year | Stockholders | Stock held |
|------|-------------|-----------|------|-------------|-----------|
| 1948 | 289 | $658,630 | 1950 | 261 | $619,550 |
| 1949 | 278 | 648,010 | 1951 | 248 | 592,480 |

Of these qualified voting stockholders of petitioner, the number listed below, holding the amount of stock shown below, were voting members of cooperatives that in turn were voting members of Northwest.

| Year | Stockholders | Stock held | Year | Stockholders | Stock held |
|------|-------------|-----------|------|-------------|-----------|
| 1948 | 167 | $371,360 | 1950 | 160 | $374,450 |
| 1949 | 176 | 403,980 | 1951 | 146 | 329,480 |

Of the qualified voting stockholders of petitioner who were not voting members of cooperatives that in turn were voting members of Northwest, the following number were patrons or members of

organizations which in turn were patrons or members of Northwest, and they held the amount of stock set out as follows:

| Year | Stockholders | Stock held | Year | Stockholders | Stock held |
|---|---|---|---|---|---|
| 1948 | 109 | $258,740 | 1950 | 90 | $219,630 |
| 1949 | 96 | 229,570 | 1951 | 89 | 235,170 |

If the above figures are combined, they indicate that in the year 1948, out of 289 qualified stockholders of petitioner, 276 were either voting members of cooperatives that were voting members of Northwest, or patrons or members of organizations which in turn were patrons or members of Northwest. These 276 stockholders held $630,100 or 95.66 per cent of the $658,630 total qualified voting stock of petitioner outstanding. Similar computations for the years 1949, 1950, and 1951 reveal that in each of those years over 95 per cent of petitioner's qualified stock outstanding was held by persons falling into one of the above categories.

OPINION.

We must first decide whether petitioner was exempt during the years involved under section 101(13), I.R.C. 1939.[1]

Section 101 provides that certain organizations shall be exempt from tax under chapter 1. Paragraph (13) of that section is as follows:

(13) Corporations organized by an association exempt under the provisions of paragraph (12), or members thereof, for the purpose of financing the ordinary crop operations of such members or other producers, and operated in conjunction with such association. Exemption shall not be denied any such corporation because it has capital stock, if the dividend rate of such stock is fixed at not to exceed the legal rate of interest in the State of incorporation or 8 per centum per annum, whichever is greater, on the value of the consideration for which the stock was issued, and if substantially all such stock (other than nonvoting preferred stock, the owners of which are not entitled or permitted to participate, directly or indirectly, in the profits of the corporation, upon dissolution or otherwise, beyond the fixed dividends) is owned by such association, or members thereof; nor shall exemption be denied any such corporation because there is accumulated and maintained by it a reserve required by State law or a reasonable reserve for any necessary purpose;

It is clear from the evidence that petitioner was organized for the purpose of financing members of exempt cooperatives and other producers, and that the dividend rate on its stock does not exceed 8 per cent per annum or the legal rate of interest of the State of Washington. But to be exempt under paragraph (13), petitioner must also have been organized by an association exempt under the

[1] All references are to the 1939 Code unless otherwise indicated. Petitioner has not argued on brief that it was exempt under section 101(10), as claimed in its amended petition, and we find no merit in such claim.

provisions of paragraph (12), or members thereof, must be operated in conjunction with such association, and, being a corporation having capital stock, substantially all of such stock must be owned by such association, or members thereof. Paragraph (12) of section 101, quoted in full in the footnote,[2] refers to farmers', fruitgrowers', or like associations organized and operated on a cooperative basis (a) for the purpose of marketing the products of members or other

---

[2] SEC. 101. EXEMPTIONS FROM TAX ON CORPORATIONS.

Except as provided in paragraph (12)(B) and in supplement U, the following organizations shall be exempt from taxation under this chapter—

\*     \*     \*     \*     \*     \*     \*

(12)(A) Farmers', fruit growers', or like associations organized and operated on a cooperative basis (a) for the purpose of marketing the products of members or other producers, and turning back to them the proceeds of sales, less the necessary marketing expenses, on the basis of either the quantity or the value of the products furnished by them, or (b) for the purpose of purchasing supplies and equipment for the use of members or other persons, and turning over such supplies and equipment to them at actual cost, plus necessary expenses. Exemption shall not be denied any such association because it has capital stock, if the dividend rate of such stock is fixed at not to exceed the legal rate of interest in the State of incorporation or 8 per centum per annum, whichever is greater, on the value of the consideration for which the stock was issued, and if substantially all such stock (other than nonvoting preferred stock, the owners of which are not entitled or permitted to participate, directly or indirectly, in the profits of the association, upon dissolution or otherwise, beyond the fixed dividends) is owned by producers who market their products or purchase their supplies and equipment through the association; nor shall exemption be denied any such association because there is accumulated and maintained by it a reserve required by State law or a reasonable reserve for any necessary purpose. Such an association may market the products of nonmembers in an amount the value of which does not exceed the value of the products marketed for members, and may purchase supplies and equipment for nonmembers in an amount the value of which does not exceed the value of the supplies and equipment purchased for members, provided the value of the purchases made for persons who are neither members nor producers does not exceed 15 per centum of the value of all its purchases. Business done for the United States or any of its agencies shall be disregarded in determining the right to exemption under this paragraph;

(B) An organization exempt from taxation under the provisions of subparagraph (A) shall be subject to the taxes imposed by sections 13 and 15, or section 117(c)(1), except that in computing the net income of such an organization there shall be allowed as deductions from gross income (in addition to other deductions allowable under section 23)—

   (i) amounts paid as dividends during the taxable year upon its capital stock, and

   (ii) amounts allocated during the taxable year to patrons with respect to its income not derived from patronage (whether or not such income was derived during such taxable year) whether paid in cash, merchandise, capital stock, revolving fund certificates, retain certificates, certificates of indebtedness, letters of advice, or in some other manner that discloses to each patron the dollar amount allocated to him. Allocations made after the close of the taxable year and on or before the fifteenth day of the ninth month following the close of such year shall be considered as made on the last day of such taxable year to the extent the allocations are attributable to income derived before the close of such year.

Patronage dividends, refunds, and rebates to patrons with respect to their patronage in the same or preceding years (whether paid in cash, merchandise, capital stock, revolving fund certificates, retain certificates, certificates of indebtedness, letters of advice, or in some other manner that discloses to each patron the dollar amount of such dividend, refund, or rebate) shall be taken into account in computing net income in the same manner as in the case of a cooperative organization not exempt under subparagraph (A). Such dividends, refunds, and rebates made after the close of the taxable year and on or before the 15th day of the ninth month following the close of such year shall be considered as made on the last day of such taxable year to the extent the dividends, refunds, or rebates, are attributable to patronage occurring before the close of such year. [Subparagraph (B) effective for taxable years beginning after December 31, 1951.]

producers, or (b) for the purpose of purchasing supplies and equipment for the use of members or other persons.

While it might be said that petitioner operates "in conjunction with" Northwest, which was during the years here involved exempt under paragraph (12), it is not as apt to say that petitioner "is operated in conjunction with" Northwest in the connotation of the statute. But in any event, we cannot find from the evidence presented that petitioner was organized by Northwest, or members thereof, or that substantially all of petitioner's capital stock was held by Northwest, or its members, as required by the statute. We, therefore, conclude that petitioner did not qualify for tax exemption under paragraph (13) for the years here involved.

Petitioner was organized in 1944 to take over the financing program conducted by the RACC since 1941. It was organized through the efforts of the LUPC whose members were fruitgrowers of the North-Central Washington area, and four of the five incorporators selected by the committee were voting members of cooperatives that were in turn voting members of Northwest. But the fact that four of the incorporators happened to be members of marketing cooperatives that may have been exempt under paragraph (12) and which were voting members of the supply cooperative that later became exempt under paragraph (12) was in our opinion merely incidental. Petitioner was not organized either by or through the efforts of "*an* association" exempt under paragraph (12), or the *members* thereof. (Emphasis supplied.) Northwest, which is the single association which it might be said petitioner is operated in conjunction with, has no individual "members"—its "members" are marketing cooperatives.

Furthermore, we cannot conclude from the evidence that "substantially all" the capital stock of petitioner was owned by "such association," or members thereof. None of petitioner's stock is owned by either Northwest or any of the marketing cooperatives who are members thereof. Even if we look through this double tier of cooperatives to determine who the individual members of Northwest might be, the evidence is that only about 60 per cent of petitioner's stock was owned by individuals who were voting members of Northwest, and we cannot say that 60 per cent is "substantially all" of the stock within the meaning of the law. And we again note that the individuals who were stockholders of petitioner were stockholders solely because they had borrowed money from petitioner and not because of any connection they may have had with any cooperative exempt under paragraph (12).

Petitioner's argument is that in determining who the "members" of Northwest were, we should look through the marketing coopera-

tives (the actual voting members of Northwest) and include as "members" of Northwest all individual fruit producers who were either voting members or patrons of marketing cooperatives which were in turn either voting members or patrons of Northwest. In other words, petitioner argues, when the statute used the word "members" of an association it was referring to individual producers and intended to include all individual producers who were in any way connected through the hierarchy of cooperatives with Northwest. The evidence shows that in each of the years here involved at least 95 per cent of petitioner's stock was owned by individuals who fall into one of those categories.

In support of this argument, petitioner points out that since the first exemptions were provided for farmers' cooperatives, the Treasury Department has adopted a liberal policy in applying these exemption provisions (see Mim. 3886, 1931-2 C.B. 164, and Regs. 74, art. 532, issued under the Revenue Act of 1928) and that such policy has received congressional approval (see S. Rept. No. 52, 69th Cong., 1st Sess., on the Revenue Act of 1926, at p. 23). Petitioner points out that the early rulings of the Treasury Department and its regulations interpreting section 101(12), I.R.C. 1939,[3] provided that an association of the type mentioned in paragraph (12) which has capital stock will be exempt if substantially all of such stock is owned by *producers* who market their products or purchase their supplies and equipment through the association. Petitioner then points out that section 29.101(13)-1 of the regulations, which deals with corporations of the type with which we are here concerned, contains the statement that "[t]he provisions of section 29.101(12)-1 relating to * * * capital stock shall also apply to corporations coming under this section." Therefore, it is claimed, we must also apply paragraph (13) liberally and conclude that if petitioner was organized by, and if its capital stock was owned by, producers who were members of or who bought anything from any cooperative which in turn was a member of or bought any supplies from Northwest, this meets the requirement of paragraph (13) that petitioner was organized by, and its stock was held by, members of an association exempt under paragraph (12).

It is true that the Treasury Department applied the exemption provisions of paragraph (12) liberally in its earlier rulings and regulations, and in fact some of the broadening provisions of those regulations have been written into paragraph (12) of the law. But to our knowledge, paragraph (13) has not been liberally interpreted or applied, and there has been no change in the wording of either the law or the regulations since this provision was first made a part of the law in the Revenue Act of 1928. At that time the Senate

---

[3] See Regs. 111, sec. 29.101(12)-1.

Finance Committee report on the bill[4] contained the following statement:

Cooperative marketing associations are exempted from tax under existing law and under section 103(12) of the bill. Such a corporation, or its *stockholders*, sometimes organize an additional corporation for the sole purpose of financing crop operations. It is provided in section 103(13) that the financing corporation shall likewise be exempt *if it conforms to the definite restrictions in the bill.* [Emphasis supplied.]

Furthermore, there are enough differences in the type of organizations covered by paragraph (12) and those covered by paragraph (13) and the manner in which they function as not to justify the inference that paragraph (13) should be interpreted or applied liberally simply because paragraph (12) originally was.

Paragraph (12) of the law itself uses the language, with reference to stock ownership, "owned by *producers* who market their products or purchase their supplies and equipment through the association," while paragraph (13) uses the words "owned by such association, or *members* thereof." (Emphasis supplied.) The difference in wording is understandable when it is recognized that paragraph (12) deals with true cooperatives, either marketing cooperatives which are required to turn back to all *producers* whose products they market the proceeds of the sales of their products, less the necessary operating expenses, whether the producer is a member or not, or supply cooperatives which must sell supplies to nonmember producers at the same price they sell to members.[5] Since 1951, any reserves set aside are either taxed to the association or must be refunded to the producers pro rata.[6]

On the other hand, corporations exempt under section 101(13) are not required to distribute their annual earnings in excess of the cost of operations either to the borrowers or patrons who paid the interest or made the deposits which made the earnings possible, or to members or patrons of any organization which is exempt under paragraph (12). Any net income of this petitioner in excess of its cost of operations may be accumulated and never paid out until it is liquidated, at which time it would be distributed to the then stockholders of the corporation who might be entirely different from the patrons whose patronage gave rise to the excess earnings.

Furthermore, the provision of the Revenue Act of 1951,[7] making paragraph (12) type organizations subject to tax on their net income not distributed as dividends to stockholders or allocated to patrons, was not made applicable to paragraph (13).

---

[4] S. Rept. No. 960, 70th Cong., 1st Sess., p. 25.
[5] Regs. 111, sec. 29.101(12)–1.
[6] Regs. 118, sec. 39.101(12)–3.
[7] Sec. 314, Revenue Act of 1951.

While we might agree that in applying paragraph (13) we could look through the marketing cooperatives to the voting members of such cooperatives to determine who the "members" of Northwest were, *Farmers Co-operative Creamery*, 21 B.T.A. 265, we see no reason for broadening the scope of paragraph (13) to include individuals who were only patrons of such cooperatives. It would appear from the correlation of paragraphs (12) and (13) that the word "members" was deliberately used in paragraph (13) while the word "producers" was used in paragraph (12). In *Producers Livestock Marketing Association*, 45 B.T.A. 325, this Court said the word "members," when used in connection with farmers' cooperatives, meant persons who share in profits and participate in management.

Judging from the Senate report quoted above, the purpose of paragraph (13) was to extend exempt status to financial auxiliaries of exempt cooperatives,[8] and for a financing corporation to be exempt, it must be organized by and operated in conjunction with and for the benefit of an association exempt under paragraph (12), or its members. In our opinion, petitioner here does not qualify. In petitioner's case, the tail is wagging the dog. Petitioner was organized independently of any association exempt under paragraph (12) and the fact that it cooperates to some extent with Northwest and that more than half of its stockholders are members of cooperatives that are members of Northwest and make use of the benefits provided by petitioner is incidental.

In 1957, after this case was docketed in this Court, petitioner requested and received a ruling from the Internal Revenue Service, dated November 14, 1957, that it was exempt under section 101(13) of the Code after December 1, 1946, the beginning of its fiscal year in which Northwest established exemption under section 101(12). The ruling was based on the assumption that petitioner was organized by Northwest and/or members thereof and operated in conjunction with that organization. The ruling was withdrawn by letter dated April 4, 1958, in which it was stated that the Tax Rulings Division had received additional evidence from the Appellate Division office in Seattle, Washington, which was not available at the time the ruling was issued which might bear on the conclusion reached.

We do not know what evidence was presented to the Internal Revenue Service upon which it based its original ruling. If, knowing the facts that have been presented to us, the Revenue Service issued its ruling based on a policy of liberal application of paragraph (13) because such policy had previously been used with other organizations similar to petitioner, it should not have withdrawn the ruling simply because it was discovered that this case was pend-

---

[8] 6 Mertens, Law of Federal Income Taxation, sec. 34.39.

996

ing in this Court, because certainly such a policy should be applied to all alike. However, that is a matter for the Revenue Service. We cannot grant a tax exemption on an inference. *Heiner* v. *Colonial Trust Co.*, 275 U.S. 232.

Having decided that petitioner was not exempt from tax, we must now decide whether the deposits of 5 cents per box of fruit sold were taxable income to petitioner in the years in which the deposits were received.

The Supreme Court defined taxable income in *Eisner* v. *Macomber*, 252 U.S. 189, 207, as follows: "Income may be defined as the gain derived from capital, from labor, or from both combined * * *." For the deposits here involved to be considered taxable income to petitioner in the year received, we would have to find that petitioner received the deposits as its own funds and subject to its unfettered control, as compensation for either loans made to borrowers from petitioner's capital, or for services rendered to borrowers by petitioner. The intent of the parties as to the nature of and purpose for the deposits, determined from the agreements between them and their actions with respect thereto, controls. *Luckenbach* v. *McCahan Sugar Co.*, 248 U.S. 139; *Clinton Hotel Realty Corp.* v. *Commissioner*, 128 F. 2d 968 (C.A. 5), reversing 44 B.T.A. 1215; *John Mantell*, 17 T.C. 1143.

It is clear from the facts in this case that the deposits were intended as indemnity for petitioner, were to remain the funds of the depositors until such time as petitioner might have to use them, and were not intended as compensation to petitioner for use of its capital or for any services rendered. Under such circumstances, the deposits were not taxable income to petitioner when received, and we so hold.

We have made rather extensive findings of fact as to the circumstances under which and the purpose for which petitioner was formed, the plan of operations adopted to serve that purpose, the terms of the agreements between the parties, and the actual manner in which the funds were handled. It is not necessary to review them in detail here. Suffice it to point out that petitioner was formed, at the suggestion of the Government, as a grower-owned vehicle to make it possible for growers to borrow the necessary funds to finance their crop operations from private sources rather than from the RACC. The RACC plan required the growers to pool their resources by depositing 2 cents per box to indemnify it against loss on loans made to any farmer in the area. These deposits were returned to the growers when the RACC ceased operations. The growers chose the same plan for setting up their own finance agency. They were told that the deposits would remain their funds unless and until needed to cover credit or operating losses.

The growers paid 6 per cent interest for the money they borrowed and a 1 per cent inspection fee for that service. In addition, they agreed to participate in the creation of a reserve fund to indemnify petitioner and the bank-lending agency against loss by allowing a deduction from the sales price of their fruit of 5 cents a box, the reserve fund so created to be kept in a separate account. The reserve fund could be pledged to the bank as security for petitioner's loans, but it was to be accounted for separately. If the amount in the fund grew beyond the reasonable needs for which it was created, the board of directors in its discretion could refund the excess to the borrowers who had contributed to the fund in the ratio of their interest in the fund. And upon dissolution of petitioner the fund was to be returned to the borrowers who deposited the funds.

In practice this reserve or trust fund scheme was meticulously carried out. Separate accounts were kept for each depositor and each one could tell at any time exactly what his interest in the fund was. While petitioner was permitted to recover operating losses from the fund, a policy was adopted by petitioner's officers and directors in the first year of its operation not to draw against the reserve fund for an operating loss if it was reasonably probable that such loss could be recovered out of prior or future years' earnings, and no operating losses have actually been charged against the reserve fund. When the reserve fund reached what was considered sufficient for its purposes, petitioner adopted a plan for refunding the excess amounts, and has carried out that plan.

Respondent points to the facts that petitioner could use this fund for any of its corporate purposes, that petitioner received the interest from the investment of this fund, that the depositors received no interest on their deposits, and that petitioner was not obligated to refund the deposits until all losses that might be charged against it had been paid, as indicia that this fund belonged to petitioner. While these are factors to consider, we do not think they are convincing under the circumstances. We find that petitioner's possible legal uses of this fund were restricted, both by the terms of the agreements under which it was established and the rather limited purposes for which petitioner was chartered. We are not here concerned with a question of who was entitled to the income from investment of the reserve fund, but the fact that no interest was payable to the depositors on the deposits and that petitioner kept the interest on the Government bonds in which the fund was invested does not change the essential nature of the transaction; nor does the fact that there was no fixed obligation to repay until liquidation of the fund or the corporation. Similar situations wherein security deposits were held not to be taxable income in the year of

receipt are found in *Boston Consol. Gas Co.* v. *Commissioner*, 128 F. 2d 473 (C.A. 1), affirming in part and reversing in part 44 B.T.A. 793; *John Mantell, supra; Broadcast Measurement Bureau, Inc.*, 16 T.C. 988; *Seven-Up Co.*, 14 T.C. 965; *Executors of Estate of George E. Barker*, 13 B.T.A. 562; *Harcum* v. *United States*, 164 F. Supp. 650 (E.D. Va.). See also *Commissioner* v. *National Grange Mut. L. Co.*, 80 F. 2d 316 (C.A. 1), affirming 31 B.T.A. 666, where, however, interest was paid on the guaranty fund. As testified to by petitioner's president, reserve funds of this sort, in cooperatives, are substitutes for capital. They are used instead of or, as in this case, in addition to capital stock because it is simpler to make a return of a reserve fund prior to the windup of a corporation than it is to make a return of amounts paid in for capital stock.

Respondent's principal legal argument is based on the "claim of right" doctrine enunciated in *North American Oil* v. *Burnet*, 286 U.S. 417, 424, wherein it was said:

If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent. * * *

In view of our conclusions that these deposits were not "income," as defined in *Eisner* v. *Macomber, supra*, to petitioner and that petitioner did not claim the deposits as its own at the time they were made, we do not think the "claim of right" doctrine is applicable. It is our understanding that the "claim of right" doctrine is concerned more with "when" income is taxable rather than whether a receipt is taxable income, and if so, to whom it is taxable. The taxpayer must be claiming ownership of the funds received and the present unfettered right to use them as its own for any purpose desired, rather than the mere claim of right to *hold* the funds for specified purposes, as is the situation here. Here, petitioner received these deposits recognizing that the funds belonged to the depositors unless and until it became necessary to use them to cover losses, so the deposits received are not income to petitioner as long as they are neither used for that purpose nor are otherwise appropriated to petitioner's use in denial of the depositors' right to the ultimate return thereof. On the other hand, had petitioner received the deposits claiming that they belonged to it unless the depositors subsequently became entitled to a refund thereof upon the happening of some future contingency, then the deposits would be income to petitioner when received.

We think this distinction is pointed up in two cases decided by this Court on the same day, being *John Mantell, supra*, wherein we held that an advance deposit by a lessee was a security deposit and

nontaxable when received, and *Jack August*, 17 T.C. 1165, wherein we held that the sum paid by the lessee was advance rental and taxable to the lessor when received. See also *Clinton Hotel Realty Corp.* v. *Commissioner, supra.*

Our conclusion on this point is also supported by *Jewelers' Safety Fund Soc.* v. *Edwards*, 24 F. 2d 385 (C.A. 2) ; *Jewelers' Safety Fund Soc.* v. *Lowe*, 274 F. 93 (C.A. 2) ; *Boston Consol. Gas Co.* v. *Commissioner, supra; Seiberling* v. *Commissioner*, 38 F. 2d 810 (C.A. 6), affirming 13 B.T.A. 55; *Broadcast Measurement Bureau, Inc., supra;* and *Seven-Up Co., supra.*

*Clay Sewer Pipe Association, Inc.*, 1 T.C. 529, affd. 139 F. 2d 130 (C.A. 3), relied upon by respondent, is distinguishable. See *John Mantell, supra,* and *Seven-Up Co., supra,* wherein it was also distinguished. The 24-cent-per-ton payment made to the taxpayer association there was the estimated cost of the services to be rendered, and when it was found that the receipts were exceeding expenditures, taxpayer placed the surplus in a "reserve for future expenses" and took a deduction on the theory that an excess of receipts over expenditures does not constitute income when the excess must subsequently be expended or returned to the payors. In disallowing the deduction, this Court pointed out that the only restriction upon the use of any of the funds received was that they should be used in the year received or in following years to furnish the services specified. The deposits in our case were not paid for any service rendered or to be rendered or for use of borrowed money. The amount deposited by an individual borrower bore no relation to the amount of his loan and, when added to the 6 per cent interest and the 1 per cent service charge paid, would have totaled in some cases approximately 29 per cent of the amount of the loan in 1 year.

Other cases cited by respondent are also primarily concerned with whether amounts received under disputed claims of ownership are taxable in the year received, and are, therefore, distinguishable, as is *Automobile Club of New York, Inc.*, 32 T.C. 906, on appeal (C.A. 2) wherein the receipts belonged to the taxpayer.

The 5-cent-per-box deposits are not taxable income to petitioner in the year received. This conclusion makes unnecessary a decision of other points raised, but because of certain concessions made,

*Decision will be entered under Rule 50.*